DAVIS, Judge.
 

 *567
 
 In this case, we address several issues arising under the felony murder rule. Jeff David Steen ("Defendant") appeals from his convictions for first-degree murder, attempted first-degree murder, and robbery with a dangerous weapon. On appeal, Defendant argues that the trial court erred by (1) limiting the scope of his expert witness's testimony regarding the reliability of the victim's identification of him as the perpetrator of an assault upon her; (2) instructing the jury that hands and arms can constitute deadly weapons in connection with the crime of attempted murder under the felony murder rule; and (3) referencing a garden hoe as a deadly weapon possibly used by the victim's assailant in its jury instructions despite the absence of evidence that a hoe was actually used in assaulting the victim. After a thorough review of the record and applicable law, we conclude that Defendant received a fair trial free from prejudicial error.
 

 Factual and Procedural Background
 

 In 2013, J.D. Furr, Defendant's 87 year-old grandfather, and Sandra Steen ("Sandra"), Defendant's 62 year-old mother, lived on a farm in
 
 *568
 
 Rowan County. Defendant was forty years old and lived twenty minutes away from the farm in Stanly County.
 

 In January 2013, Defendant borrowed $1,000 from Furr to pay for repairs to his car and promised to pay the money back within two weeks. By June 2013, he had paid back approximately $550 and had reached an agreement with Furr to perform work on the farm as a means of satisfying the remaining portion of the debt.
 

 In the fall of 2013, Sandra took out a $3,084.64 loan, in part, to assist Defendant with making his car payments. Defendant agreed to make monthly loan payments to Sandra beginning in October 2013 and promised to pay off the entirety of the loan by January 2014. He had been borrowing money from his mother since he was a teenager and owed her a total amount of between $4,000 and $6,000. Sandra testified that "right before" 5 November 2013 both she and Furr separately informed Defendant that they would not loan him any more money. As of 5 November 2013, Defendant's checking account contained a balance of only $3.64.
 

 On the evening of 5 November 2013, Defendant was at the farm fixing a ceiling fan for his grandfather. After completing his work on the fan, Sandra gave him the bill for that month's loan payment, and Defendant told her he would "take care of it." Sandra then went to her car to retrieve some items that she intended to store in a nearby outbuilding. While she was doing so, Defendant came out of the house and told her that he had to go to work. Sandra later testified that she did not recall either hearing Defendant get into his vehicle or hearing his car drive away.
 

 Upon retrieving the items intended for storage from her vehicle, Sandra went inside the outbuilding. After remaining there for
 
 *481
 
 five to ten minutes, she thought she heard raised voices and believed that Furr might be calling for her. She had begun walking in the direction of the house when she felt someone place their right arm around her neck.
 

 At trial, Sandra testified that she initially believed that Defendant had wrapped his arm around her neck as a joke to "play a trick on [her]." As the assailant began tightening his grip around her neck, however, she realized the person was "trying to kill [her]." Her attacker was wearing a dark-colored ski mask, and Sandra could not see his face except for his eyes. The assailant then placed his left hand over her nose and mouth. Sandra testified that at that point she "started trying to punch or grab whatever [she] could, and then everything went black."
 

 *569
 
 Defendant testified on his own behalf at trial. He stated that on the night of 5 November 2013, he clocked in at his workplace at approximately 10:30 p.m. and worked from 11:00 p.m. until 7:00 a.m. Following the conclusion of his shift, he went back to his home to change clothes and then drove to his grandfather's farm to work on a fence. Defendant reached the farm at approximately 8:00 a.m.
 

 Upon arrival, Defendant saw his mother lying near the driveway close to the storage building. He approached her and saw that her face was swollen, one of her eyes was shut, and there was "blood all around" her. Defendant asked her what had happened, and she responded that she needed help. As he was speaking to Sandra, he noticed his grandfather "laying down at the foot of the steps" of the house. He called 911, and after he explained the circumstances the dispatcher told him to check on his grandfather.
 

 Defendant found Furr lying by the back door of the farmhouse. There was a lot of blood "pooled up" by his head area. Defendant shook Furr and realized that he was dead. Defendant also picked up his grandfather's wallet and then placed it back on the ground without removing any of its contents. At that point, Defendant returned to his mother. It was a cold morning, and he observed that she was shaking and that "her whole body was freezing" cold. After unsuccessfully searching for blankets with which to cover his mother in order to keep her warm, Defendant lay down next to Sandra and held her until EMS personnel arrived.
 

 Paramedics transported Sandra to Stanly Regional Medical Center, and she was subsequently airlifted from that location to Carolinas Medical Center ("CMC") in Charlotte. At CMC, she was diagnosed with a skull fracture, multiple rib fractures, a collapsed lung, and hypothermia. The treating physician noted that Sandra had suffered an "assault [by] unspecified means."
 

 It was determined by autopsy that Furr died from blunt force injuries to his head and neck. An officer responding to the 911 call testified that Furr's body was within "eyesight of where [Sandra] was assaulted[.]" A garden hoe containing Furr's blood on it was found near his body. The medical examiner testified that the possibility Furr had been beaten with the garden hoe was "consistent with most, if not all, of [Furr's] injuries." Furr's wallet was found near his body with his blood on it. The money that the wallet normally contained had been removed. Other than the money taken from Furr's wallet, nothing else was taken or missing from the farm or its outbuildings. No unfamiliar
 
 *570
 
 vehicles or individuals were seen by neighbors in the area of the farm on the night of 5 November 2013.
 

 Defendant cooperated with law enforcement officers during their investigation and consistently denied any involvement in the assault of his mother or the murder of his grandfather. Officers responding to the scene observed that he had multiple scratches on both of his arms as well as an injury to his upper lip. No blood was found in Defendant's vehicles. His clothing was not examined for the presence of blood.
 

 With regard to the scratches on his arm, Defendant told officers at the crime scene that Sandra had scratched him that morning while he was holding her as he waited for the arrival of paramedics. The day after the attacks, he told a cousin that he thought he could have gotten the scratches at work. During a subsequent interview with law enforcement officers, Defendant stated that he
 
 *482
 
 might have scratched his arms on a door frame while fixing Furr's ceiling fan.
 

 The North Carolina State Crime Laboratory performed both fingerprint and DNA testing on the garden hoe. No latent fingerprints were found on the hoe. The DNA taken from both the hoe and Furr's wallet matched Furr but did not match Defendant. Testing performed on scrapings taken from Sandra's fingernails indicated that the DNA contained therein matched Sandra and excluded Defendant. In addition, a hair contained in the fingernail scrapings belonged to Sandra.
 

 Sandra was interviewed by law enforcement officers on multiple occasions while she was hospitalized. Her first interview occurred on 6 November 2013 in the emergency room at Stanly Regional Medical Center. She told the officers that she was attacked from behind about ten minutes after Defendant had left the farm by someone wearing a dark-colored ski mask and dark clothing and that she blacked out after being hit on the head with "something hard." Sandra further stated that her attacker was muscular, had dark eyes, and could have been either white or "Mexican." She also told officers that the assailant could not have been Defendant because he was taller than the person who attacked her.
 

 Later that same day, after being transferred to CMC, Sandra gave another interview. During her second interview, officers asked her if she thought that it could have been Defendant who assaulted her. She responded that it could not have been him because Defendant was too tall and he was "tore all to pieces" upon discovering her and Furr's body the morning after the attacks. Also during this interview, one of the officers asked Sandra: "What would you think if I told you that Jeff had a whole lot of scratches on his arm? Would you think that maybe Jeff done it again like you did at first?" In response, she reiterated that her attacker
 
 *571
 
 could not have been Defendant and stated that he might have scratched his arm while working on the ceiling fan earlier that day.
 

 Officers conducted a third interview with Sandra the following day. She told them that if they were considering Defendant as a suspect they were "barking down the wrong tree." She also stated that she thought she remembered hearing Defendant's car leave the farm on the night of the attacks and that she might have scratched him the morning after the attack while he was holding onto her.
 

 Sandra gave her final recorded statement to law enforcement officers on 21 November 2013. Her recollection of the assault on this occasion was markedly different from the prior occasions on which she was interviewed. During this interview, she stated that she saw Defendant's face when her attacker opened her eye to see whether she was dead or alive. She further told the officers that she had previously been in denial but now believed that her son was, in fact, her attacker.
 

 On 9 December 2013, Defendant was indicted on charges of first-degree murder, attempted first-degree murder, and robbery with a dangerous weapon. His trial began on 9 January 2017 in Rowan County Superior Court before the Honorable Nathaniel J. Poovey.
 

 At trial, Sandra testified that she had seen Defendant's face during the attack and that a traumatic brain injury counselor at CMC had assisted her in coming to this realization. The following exchange occurred on cross-examination between Sandra and counsel for Defendant with regard to inconsistencies between her pre-trial statements to law enforcement officers and her testimony at trial:
 

 [DEFENSE COUNSEL]: When the detective asked you about where you saw the mask or the face, you told him it was one of these pull over masks ... didn't you?
 

 [SANDRA]: There was no mask. There was no mask.
 

 [DEFENSE COUNSEL]: The kind of -- the kind of mask where you wear when you go rob somebody. Isn't that what you said?
 

 [SANDRA]: There was no mask. I had been dreaming all kind of crazy dreams laying up there in ICU.
 

 [DEFENSE COUNSEL]: You stayed consistent from the first statement to this statement the next day that the individual had a mask. You stayed consist[ent] with
 
 *483
 
 [the] fact that he was larger than you, taller than you and muscular.
 
 *572
 
 [SANDRA]: I was trying my best to figure it out.
 

 [DEFENSE COUNSEL]: Well, why didn't you tell them you didn't -- you don't know?
 

 [SANDRA]: Because they was wanting something, and I was just making up stuff. Just -- whatever was in my head, I thought it was real.
 

 [DEFENSE COUNSEL]: Well, you --
 

 [SANDRA]: I thought it was real until that lady said what she did. And when she said what she did about traumatic brain injuries, that you don't know when they happen, but you know before and after and that's when I was able to put into place that was [Defendant's] arm coming around my neck, that was [Defendant] choking me, and then it was [Defendant] knocking me out.
 

 And then when my left eyelid was raised up, that was [Defendant's] face in front of me. And because we have two really bright yard lights, I was able to see his [face] very clearly. And I thought he was there to help me.
 

 Defendant offered testimony from Dr. George Corvin as an expert witness in general and forensic psychiatry who was qualified to testify with regard to "a psychiatric symptom" known as "confabulation." A
 
 voir dire
 
 hearing took place outside the presence of the jury concerning the permissible scope of his testimony.
 

 On
 
 voir dire
 
 , Dr. Corvin defined confabulation as "the spontaneous production of false memories or distorted memories in patients who have ... sustained closed head injuries or other medical trauma resulting in periods of amnesia." He further explained that "induced confabulation" can occur where a person in a position of authority or trust tells or implies to an individual suffering from amnesia what actually occurred during a period of time for which the individual has no genuine memories. At the conclusion of the
 
 voir dire
 
 hearing, the trial court ruled that Dr. Corvin would be permitted to testify generally about "those who are susceptible and the risk factors for confabulation," but would not be permitted to testify as to whether specific questions that officers had asked Sandra could have caused confabulation to actually occur.
 

 Dr. Corvin subsequently testified before the jury, explaining what confabulation is and how it can occur. Although he did not testify with regard to the specific manner in which Sandra was questioned by law
 
 *573
 
 enforcement officers, he stated that she would "have an elevated propensity for both the experience of amnesia but also to experience confabulation as a result of that amnesia. Both from her psychological and physical trauma."
 

 Defendant testified on his own behalf. He denied attacking his mother or grandfather and stated that he was either at home or at work when the crimes occurred. He testified that he had been unaware that he had scratches on his arms at the time when officers first brought the scratches to his attention and that he told them his mother had scratched him because it "was the first thing that popped in [his] mind." He explained that he later told officers that he scratched himself while working on his grandfather's fan because he was trying to retrace his steps and "figure anything that might have happened that could have caused ... a scratch on [his] arm." Defendant also testified that he had a cat that "liked to scratch [him] sometimes" but that he likely received the majority of the scratches performing "activities around the house or working." On cross-examination, he acknowledged that he did not know the actual origin of the scratches.
 

 At the charge conference, the trial court informed counsel that it intended to instruct the jury on first-degree murder based upon theories of premeditation and deliberation, lying in wait, and felony murder predicated on the underlying felony of robbery with a dangerous weapon. The State requested that the court also instruct the jury on the theory of felony murder based on the underlying felony of attempted murder with a deadly weapon. The prosecutor asserted that - for purposes of her requested instruction - either Defendant's hands and arms or the garden hoe constituted deadly weapons. Counsel for Defendant objected on the ground that the State had presented insufficient evidence
 
 *484
 
 that a deadly weapon was used in the attempted murder of Sandra so as to warrant the instruction. After hearing the arguments of counsel, the trial court stated its intention to give the State's requested instruction.
 

 On 1 February 2017, the jury convicted Defendant of first-degree murder, attempted first-degree murder, and robbery with a dangerous weapon. The jury specified on the verdict sheet that the first-degree murder conviction was based solely upon the felony murder rule predicated on the underlying felony of attempted first-degree murder.
 
 [1]
 
 The trial court arrested judgment on the attempted murder conviction and
 
 *574
 
 sentenced Defendant to life imprisonment without the possibility of parole for the first-degree murder conviction. Defendant was also sentenced to a term of 64 to 89 months imprisonment for the robbery with a dangerous weapon conviction. Defendant gave timely notice of appeal to this court.
 

 Analysis
 

 In this appeal, Defendant makes three primary arguments. First, he contends that the trial court erred by prohibiting Dr. Corvin from testifying concerning the impact of specific leading questions asked by law enforcement officers during their interviews with Sandra. Second, he argues that instructing the jury that hands and arms can constitute deadly weapons for purposes of the felony murder rule constituted error. Finally, he asserts that the court improperly instructed the jury that it could convict him of first-degree murder under the felony murder rule if it found that he attempted to murder Sandra with a garden hoe because no evidence was introduced that a hoe was used in the attack on Sandra. We address each argument in turn.
 

 I. Testimony of Dr. Corvin
 

 Defendant first contends that the trial court abused its discretion by improperly limiting the scope of the testimony of his expert witness, Dr. Corvin. He argues that had Dr. Corvin been permitted to testify about the possible impact upon Sandra's memory of specific leading questions posed to her by law enforcement officers there exists "a reasonable possibility Dr. Corvin's testimony may have impacted the outcome of the trial[.]" We disagree.
 

 The admissibility of expert witness testimony is governed by Rule 702 of the North Carolina Rules of Evidence. Rule 702 provides, in pertinent part, as follows:
 

 (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 *575
 
 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C. R. Evid. 702(a).
 

 A trial court's ruling on "whether the proffered expert testimony meets Rule 702(a) 's requirements of qualification, relevance, and reliability ... will not be reversed on appeal absent a showing of abuse of discretion."
 
 State v. McGrady
 
 ,
 
 368 N.C. 880
 
 , 893,
 
 787 S.E.2d 1
 
 , 11 (2016) (citation and quotation marks omitted). "[A] trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision."
 

 Id.
 

 (citation, quotation marks, and brackets omitted). Moreover, an evidentiary error "is not prejudicial unless there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial."
 
 State v. Mason
 
 ,
 
 144 N.C. App. 20
 
 , 27,
 
 550 S.E.2d 10
 
 , 16 (2001) (citation, quotation marks, and brackets omitted).
 

 *485
 
 At trial, Dr. Corvin was permitted to define confabulation for the jury and to explain the manner in which it could affect the memories of persons afflicted with periods of amnesia following a traumatic injury. He further testified that based on his review of Sandra's medical records
 
 [2]
 
 a risk of confabulation existed due to the nature and location of the traumatic brain injury that she suffered as a result of the attack. Dr. Corvin also explained the concept of "induced confabulation":
 

 [A]s human beings, we always look for cues. And -- so if somebody is talking to us, they may say things or ask things that imply what -- what the answer is about what happened during the time in question. And in induced confabulation, what happens is you pick up these cues. You pick up the positive, sort of, feedback that you get from giving the right answer.
 

 And what happens is that those things that you're hearing in your environment, suddenly will be -- not suddenly -- gradually will become your memory. And -- so you might talk to -- let's say you have amnesia for a period of time after an accident and your wife or husband was there. And
 
 *576
 
 they tell you, kind of, what they say happened. You don't know what happened.
 

 Well, after a time of talking to him about it, you may ... remember it yourself. Not -- you don't remember it such that your husband or wife told you, you remember it and that's called induced confabulation. You get help filling in the gaps, but you're unaware of it as it's happening.
 

 Although the trial court prohibited Dr. Corvin from proceeding to testify as to the relationship between any specific questions that officers asked Sandra and the potential for confabulation to have occurred regarding her identification of Defendant as her attacker, Defendant's counsel made the following statements during his closing argument to the jury:
 

 On November 6th at CMC, [Sandra] talked to [law enforcement officers], and when she gave those statements she said, "I didn't see who it was. He had a mask on, a ski mask. He was too tall -- or was too short to be Jeff. Jeff's taller. He had dark eyes. I couldn't see his face. I saw his beady eyes." That's what you heard, and that didn't match the theory of the police officers.
 

 So what did they do? They went back up there November 7th, and I think one of them, either Detective Loflin or Detective Allen, said, "You know, Sandra, we hope this is the last time we got to come up here, and they spent the next how many ever minutes, hour trying to get her to tell them it was [Defendant]. How did they do that? Well, you know, "Hey, Detective Allen, aren't you going to tell them about [Defendant's] scratches? Tell her -- well, tell her about those.["] ["]Well -- well, Sandra, what do you think if I told you [Defendant] had some? Would you think it's him then?["]
 

 ....
 

 You know, Dr. Corvin came in here and testified, "You know, when you have a traumatic brain injury ... you're more susceptible to being" -- to what he called "confabulated." That's a word I had never heard before this case. But essentially it means you're more susceptible to agreeing with what they want you to say, and that's exactly what happened.
 

 *577
 
 Even assuming, without deciding, that the limitation on Dr. Corvin's testimony by the trial court constituted error, we are unable to agree with Defendant that any such error rose to the level of reversible error. As noted above, in his testimony Dr. Corvin defined the concept of induced confabulation for the jury and explained why Sandra's injury placed her at risk of creating memories that were not genuine. Furthermore, in his closing argument Defendant's counsel made clear to the jury the defense's theory that the manner in which Sandra was questioned by law enforcement officers caused her to create false memories of the attack.
 

 As a result, jurors were expressly given the opportunity to consider the possibility that Sandra's identification of Defendant was
 
 *486
 
 the result of confabulation. Therefore, Defendant has failed to show a reasonable possibility that a different result would have been reached had Dr. Corvin been permitted to testify without restriction.
 
 See
 

 In re Chasse
 
 ,
 
 116 N.C. App. 52
 
 , 60,
 
 446 S.E.2d 855
 
 , 860 (1994) (exclusion of expert testimony was harmless error where error was not prejudicial).
 

 II. Jury Instructions
 

 A. Hands and Arms as Deadly Weapons for Purposes of Felony Murder Rule
 

 Defendant next argues that the trial court erred by charging the jury that his hands and arms could constitute deadly weapons for purposes of the felony murder rule based upon the underlying felony of attempted murder with a deadly weapon. He contends that "[a]llowing hands and arms to be a deadly weapon when an adult is killed vastly and improperly expands the felonies which could support a conviction for felony murder." We disagree.
 

 In the present case, the trial court instructed the jury, in pertinent part, as follows:
 

 I further charge that for you to find the defendant guilty of first-degree murder under the first-degree felony murder rule based upon the underlying felony of attempted first-degree murder, the State must prove four things beyond a reasonable doubt:
 

 ....
 

 And fourth, that the attempted first-degree murder was committed with the use of a deadly weapon. The State contends and the defendant denies that the defendant used his hands and/or arms, and or a garden hoe as a deadly weapon.
 

 *578
 
 A deadly weapon is a weapon which is likely to cause death or serious bodily injury. In determining whether the instrument is a deadly weapon, you should consider its nature, the manner in which it was used and the size and strength of the defendant as compared to the victim.
 

 "Our Court reviews a trial court's decisions regarding jury instructions
 
 de novo
 
 ."
 
 State v. Jenkins
 
 ,
 
 202 N.C. App. 291
 
 , 296,
 
 688 S.E.2d 101
 
 , 105 (citation omitted),
 
 disc. review denied
 
 ,
 
 364 N.C. 245
 
 ,
 
 698 S.E.2d 665
 
 (2010). "First-degree murder by reason of felony murder is committed when a victim is killed during the perpetration or attempted perpetration of certain enumerated felonies or a felony committed or attempted with the use of a deadly weapon."
 
 State v. Gibbs
 
 ,
 
 335 N.C. 1
 
 , 51,
 
 436 S.E.2d 321
 
 , 350 (1993) (citation omitted),
 
 cert. denied
 
 ,
 
 512 U.S. 1246
 
 ,
 
 114 S.Ct. 2767
 
 ,
 
 129 L.Ed.2d 881
 
 (1994) ;
 
 see also
 

 N.C. Gen. Stat. § 14-17
 
 (a) (2017) (a murder "committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon" constitutes first-degree murder).
 

 This Court has repeatedly held that hands, arms, and feet can constitute deadly weapons in certain circumstances "depending upon the manner in which they were used and the relative size and condition of the parties."
 
 State v. Allen
 
 ,
 
 193 N.C. App. 375
 
 , 378,
 
 667 S.E.2d 295
 
 , 298 (2008) (citation omitted);
 
 see also
 

 State v. Harris
 
 ,
 
 189 N.C. App. 49
 
 , 60,
 
 657 S.E.2d 701
 
 , 709 (2008) (jury was "properly allowed to determine whether Defendant's hands and feet constituted deadly weapons" where male defendant outweighed female victim by 65 pounds);
 
 State v. Jacobs
 
 ,
 
 61 N.C. App. 610
 
 , 611,
 
 301 S.E.2d 429
 
 , 430 (fists could have constituted deadly weapons where defendant was 39 year-old male and victim was 60 year-old female),
 
 disc. review denied
 
 ,
 
 309 N.C. 463
 
 ,
 
 307 S.E.2d 368
 
 (1983).
 

 Although our appellate courts have not specifically addressed whether hands and arms may constitute deadly weapons for purposes of the crime of attempted murder under the felony murder rule, our Supreme Court has held that the offense of felony child abuse could serve as the predicate felony for felony murder where the defendant used his hands as a deadly weapon in the course of committing the abuse. In
 
 State v. Pierce
 
 ,
 
 346 N.C. 471
 
 ,
 
 488 S.E.2d 576
 
 (1997), the defendant was an adult male who violently shook his two-and-a-half year-old niece, resulting in the child's death.
 
 Id.
 
 at 493,
 
 488 S.E.2d at 589
 
 . The Court stated that "[w]hen a strong or mature person makes an attack
 
 *487
 

 *579
 
 by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons."
 

 Id.
 

 Consequently, the Supreme Court concluded that the evidence "was sufficient to permit the jury to conclude that defendant committed felonious child abuse and that he used his hands as deadly weapons. Thus, the trial court did not err by refusing to grant defendant's motion to dismiss the charge of first-degree murder under the felony murder rule."
 

 Id.
 

 Defendant argues that the Supreme Court's holding in
 
 Pierce
 
 should be confined to the child abuse context. In his brief, he contends that "[h]ands may be a deadly weapon for purposes of felony assault and felony murder based on felony child abuse depending on the circumstances, but not for purposes of felony murder when the predicate felony is the attempted murder of an adult." However, he presents no compelling argument as to why children should be treated differently from vulnerable adults in this context or why jurors should not be permitted to make such a determination for themselves.
 

 Here, Defendant was 40 years old and Sandra was 62 years old. He was 5 feet, 11 inches tall and weighed 210 pounds while she was 5 feet, four inches tall and weighed 145 pounds. During the assault, Sandra's assailant engaged in a violent attack on her while using his hands and arms that resulted in extensive injuries to her, including multiple rib fractures and a collapsed lung. Thus, we are of the view that the question of whether Defendant's hands and arms constituted deadly weapons was a matter for determination by the jurors and that the trial court therefore did not err by submitting this issue to the jury.
 
 See
 

 State v. Grumbles
 
 ,
 
 104 N.C. App. 766
 
 , 770,
 
 411 S.E.2d 407
 
 , 410 (1991) (issue of whether defendant's hands were deadly weapons was properly submitted to jury where evidence showed "the great disparity in the size of the victim and defendant").
 

 Nor are we persuaded by Defendant's alternative argument that a weapon must be "external" in order to constitute a deadly weapon for purposes of the felony murder rule. In support of this proposition, he directs our attention to
 
 State v.
 

 Hinton
 
 ,
 
 361 N.C. 207
 
 ,
 
 639 S.E.2d 437
 
 (2007). In
 
 Hinton
 
 , our Supreme Court held that the defendant's hands and feet could not constitute dangerous weapons under
 
 N.C. Gen. Stat. § 14-87
 
 (a), the statute criminalizing robbery with a dangerous weapon.
 

 Id.
 

 at 211-12
 
 ,
 
 639 S.E.2d at 440
 
 . In reaching this determination, the Court noted that
 
 N.C. Gen. Stat. § 14-87
 
 (a) "prohibits the use or threatened use of any
 
 firearms or other dangerous weapon, implement or means
 
 " in the course of a robbery.
 

 Id.
 

 at 211
 
 ,
 
 639 S.E.2d at 440
 
 (emphasis added and quotation marks omitted). As a result, the Supreme Court concluded
 
 *580
 
 that "the General Assembly intended to require the State to prove that a defendant used an
 
 external
 
 dangerous weapon before conviction under the statute is proper."
 
 Id.
 
 at 211-12,
 
 639 S.E.2d at 440
 
 (emphasis added).
 

 We decline Defendant's invitation to extend the holding of
 
 Hinton
 
 beyond the parameters of the particular context in which it was decided. Unlike
 
 N.C. Gen. Stat. § 14-87
 
 ,
 
 N.C. Gen. Stat. § 14-17
 
 (the statute governing felony murder) contains no language suggesting any intent by the General Assembly to limit the possible types of weapons that can qualify as "deadly weapons" for purposes of the felony murder rule to external weapons. Therefore, this argument is overruled.
 

 B. Sufficiency of Evidence to Support Reference to Garden Hoe in Jury Instructions
 

 Finally, Defendant argues that the trial court erred by instructing the jury that it could convict him of first-degree murder if it found that he attempted to murder Sandra with a garden hoe - as an alternative type of deadly weapon - because insufficient evidence existed that the hoe was used in the attack on his mother. He contends that "[i]t was pure speculation that the hoe was used in [Sandra's] attempted murder" and that, for this reason, the reference to the hoe in the instruction constituted reversible error given prior decisions from North Carolina courts prohibiting jury instructions on theories of guilt not supported by the evidence presented at trial.
 

 *488
 
 The State, conversely, contends that (1) the weapons identified in the challenged portion of the jury instructions were merely "evidentiary components" rather than distinct theories of the crime of attempted murder such that any error in mentioning the garden hoe was not prejudicial; (2) the reference to the garden hoe was, in fact, sufficiently supported by the evidence; and (3) even assuming
 
 arguendo
 
 that the reference to the garden hoe was erroneous, Defendant cannot demonstrate that he was prejudiced by the instruction.
 

 As noted above, the specific portion of the jury instruction referencing the garden hoe stated as follows:
 

 [T]hat the attempted first-degree murder was committed with the use of a deadly weapon. The State contends and the defendant denies that the defendant used his hands and/or arms,
 
 and or a garden hoe
 
 as a deadly weapon.
 

 (Emphasis added.)
 

 It is well established that "[a] trial judge should not give instructions which present to the jury possible theories of conviction not supported
 
 *581
 
 by the evidence."
 
 State v. Odom
 
 ,
 
 99 N.C. App. 265
 
 , 272,
 
 393 S.E.2d 146
 
 , 150 (citations omitted),
 
 disc. review denied
 
 ,
 
 327 N.C. 640
 
 ,
 
 399 S.E.2d 332
 
 (1990). However, "[i]f a party requests a jury instruction which is a correct statement of the law and which is supported by the evidence, the trial judge must give the instruction at least in substance."
 
 State v. Cornell
 
 ,
 
 222 N.C. App. 184
 
 , 191,
 
 729 S.E.2d 703
 
 , 708 (2012) (citation omitted).
 

 Our Supreme Court has recently addressed the scenario in which a trial court instructs the jury disjunctively as to two distinct theories of a crime where one of the theories was unsupported by the evidence. In
 
 State v. Malachi
 
 , --- N.C. ----,
 
 821 S.E.2d 407
 
 (2018), the defendant was charged with possession of a firearm by a felon and carrying a concealed weapon after officers discovered a handgun in the waistband of his pants.
 

 Id.
 

 at ----,
 
 821 S.E.2d at 410
 
 . With regard to the possession of a firearm by a felon charge, the trial court instructed the jury on the principles of both actual and constructive possession.
 
 Id
 
 . On appeal, this Court held that the trial court committed reversible error by instructing the jury on the theory of constructive possession where "the State's evidence supported an instruction only for actual possession[.]"
 
 State v. Malachi
 
 , --- N.C. App. ----, ----,
 
 799 S.E.2d 645
 
 , 649 (2017),
 
 reversed
 
 , --- N.C. ----,
 
 821 S.E.2d 407
 
 (2018).
 

 The Supreme Court reversed the decision of this Court, holding that although the trial court did, in fact, err by instructing the jury on constructive possession, the error was not prejudicial to the defendant.
 
 Malachi
 
 , --- N.C. at ----,
 
 821 S.E.2d at 422
 
 . In holding that a defendant's challenge to a jury instruction that permitted conviction under a theory unsupported by the evidence is subject to "traditional harmless error analysis," the Court explained its reasoning as follows:
 

 As a general proposition, a defendant seeking to obtain appellate relief on the basis of an error to which he or she lodged an appropriate contemporaneous objection at trial must establish that there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. However, the history of this Court's decisions in cases involving the submission of similar erroneous instructions and our consistent insistence that jury verdicts concerning a defendant's guilt or innocence have an adequate evidentiary foundation persuade us that instructional errors like the one at issue in this case are exceedingly serious and merit close scrutiny to ensure
 
 *582
 
 that there is no reasonable possibility that the jury convicted the defendant on the basis of such an unsupported legal theory. However, in the event that the State presents exceedingly strong evidence of defendant's guilt on the basis of a theory that has sufficient support and the State's evidence is neither in dispute nor subject to serious credibility-related questions, it is unlikely that a reasonable jury would elect to convict the defendant on the basis of an unsupported legal theory.
 

 Id.
 

 at ----,
 
 821 S.E.2d at 421
 
 (internal citation and quotation marks omitted).
 

 *489
 
 Defendant argues that the challenged instruction was both erroneous and prejudicial under the standard set out by the Supreme Court in
 
 Malachi
 
 . He contends that absent the reference to the garden hoe "there is a reasonable possibility that ... the jury would have returned a different verdict[.]" For the reasons set out below, however, we hold that any error resulting from this instruction was harmless even assuming that (1) the weapons listed in the challenged instruction did, in fact, constitute separate and distinct theories of the crime of attempted murder; and (2) the reference to the garden hoe was unsupported by the evidence.
 

 Sandra testified that her attacker grabbed her from behind and tightly wrapped his right arm around her neck before placing his left hand over her nose and mouth. A struggle then ensued between Sandra and her attacker until she lost consciousness. The injuries Sandra sustained included a skull fracture, multiple rib fractures, and a collapsed lung. Such testimony clearly constitutes substantial evidence to support an instruction that hands and arms were used as weapons during the attack on her. Conversely, although the evidence plainly established that the garden hoe was used to murder Furr, no evidence was presented specifically linking the garden hoe to Sandra's attack. Thus, evidence was presented in support of only one of the deadly weapon theories instructed on by the trial court - that is, the theory that Defendant attempted to murder Sandra with his hands and arms. Based on our application of the principles articulated by the Supreme Court in
 
 Malachi
 
 , however, we conclude the error in referencing the hoe was harmless.
 

 First, the most critical piece of evidence for the State was Sandra's identification of Defendant as her attacker. The jury had a full and fair opportunity to evaluate the reliability of her testimony in light of the conflicting pre-trial statements she made to law enforcement officers on this subject and the testimony of Dr. Corvin regarding confabulation.
 

 *583
 
 In finding Defendant guilty, the jury clearly determined that her identification of Defendant was reliable. It cannot reasonably be argued that the brief reference to the hoe in the jury instructions impacted the jury's decision to accept her trial testimony regarding Defendant's guilt as true.
 
 [3]
 

 We are unable to construe
 
 Malachi
 
 as requiring a finding of reversible error under these circumstances. While the circumstances at issue in
 
 Malachi
 
 were somewhat different than those existing here, the essence of the Supreme Court's decision was that errors by a trial court in instructing the jury on a theory of guilt unsupported by the evidence are subject to a harmless error analysis. In the present case - for the reasons set out above - we cannot see how the brief reference to the garden hoe in the jury instructions could have affected the jury's determination as to the credibility of Sandra's identification of Defendant and, therefore, its verdict. Accordingly, we hold that the trial court did not commit reversible error in its instructions to the jury.
 

 Conclusion
 

 For the reasons stated above, we conclude that Defendant received a fair trial free from prejudicial error.
 

 NO PREJUDICIAL ERROR.
 

 Judge BERGER concurring in separate opinion.
 

 Judge HUNTER, JR. concurring in part, dissenting in part by separate opinion.
 

 BERGER, Judge, concurring in separate opinion.
 

 I concur with the majority opinion, but would conclude that the instruction provided by the trial court regarding the garden hoe was supported by the evidence.
 

 Even though Ms. Steen lost consciousness during the attack, she told investigators that she had been hit in the head with something hard. She testified that
 

 [t]he first time, I was hit on the side of my head. I had - I had fractures on my skull.
 

 *490
 
 That's what knocked me out
 
 *584
 
 the first time and put me on the ground. And then that's when I seen [Defendant] when he raised my left eyelid up, and then I was blacked out again. That would have been the second blow to my head that put the hole in the back of my head.
 

 Ms. Steen also testified that Defendant "knock[ed] me out," that she had been "beaten in the head," and that she "did not want to believe that my son would knock a hole in my head."
 

 Evidence presented at trial showed, in addition to a collapsed lung, that Ms. Steen also suffered multiple rib fractures, a fracture to her skull, brain hemorrhaging, and traumatic brain injury. These are not the types of injuries that would customarily be associated with an assault in which the perpetrator simply choked the victim. The jury could reasonably infer that Ms. Steen's injuries were inflicted with a blunt force object.
 

 There was a blunt force object within eyesight of the area where Ms. Steen had been assaulted: the garden hoe which had been used to murder Mr. Furr. This blunt force object was used by the same perpetrator who attacked Ms. Steen. The garden hoe was used in the same time period as the assault on Ms. Steen, and it was used in close proximity to Ms. Steen.
 

 The evidence presented supported the jury instruction regarding the garden hoe, and I would conclude that the trial court's instruction was not in error.
 

 HUNTER, Judge, concurring in part, dissenting in part.
 

 While I concur with the majority's analysis on the remaining issues, I respectfully dissent on the issue of whether Defendant has demonstrated reversible error from the trial court's erroneous jury instruction referencing the hoe as a weapon used in the attack on Sandra. In
 
 State v. Malachi
 
 , --- N.C. ----,
 
 821 S.E.2d 407
 
 (2018) our Supreme Court expressly noted that harmless error was most likely to exist in cases where the State presents strong evidence of guilt that is not "subject to serious credibility-related questions[.]"
 

 Id.
 

 at ----,
 
 821 S.E.2d at 421
 
 .
 

 In the present case, the majority rests its conclusion on the fact that the jury's verdict must mean that it found Sandra's identification of Defendant as her attacker to be credible. However, given the various widely conflicting pre-trial statements that she gave -all but one of
 
 *585
 
 which flatly denied that Defendant was her assailant - her testimony clearly raised, in my view, the sort of serious credibility questions contemplated by the Supreme Court in
 
 Malachi
 
 .
 

 Moreover, the remaining evidence presented by the State was far from conclusive as to Defendant's guilt. No fingerprints were found on the garden hoe. The DNA profile obtained from the hoe did not match Defendant, nor did the DNA obtained from Furr's wallet. Likewise, testing performed on scrapings taken from Sandra's fingernails excluded Defendant as a contributor. Indeed, the DNA sample taken from these scrapings not only excluded Defendant but also contained an allele from an unknown third party that was neither Defendant nor Sandra. Law enforcement also found no blood in Defendant's vehicles and did not test his clothes for the presence of blood. In short, no physical evidence of any kind linked Defendant to the crimes.
 

 For these reasons, I believe Defendant has shown that he is entitled to a new trial. Accordingly, I respectfully dissent.
 

 [1]
 

 The jury specifically rejected the State's alternative theories of first-degree murder based upon (1) premeditation and deliberation; (2) lying in wait; and (3) felony murder with the underlying felony being robbery with a dangerous weapon.
 

 [2]
 

 Dr. Corvin did not personally meet with Sandra. His testimony was based entirely on his review of her medical records and the statements she gave to law enforcement officers.
 

 [3]
 

 We note that the State's closing argument did not even mention the hoe as having been used in the attack on Sandra.