IN THE SUPREME COURT OF NORTH CAROLINA

No. 141A19

Filed 18 December 2020

STATE OF NORTH CAROLINA

v.

JEFF DAVID STEEN

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 264 N.C. App. 566, 826 S.E.2d 478 (2019), finding no error in judgments entered on 1 February 2017 by Judge Nathaniel J. Poovey in Superior Court, Rowan County, based upon defendant's convictions for first-degree murder, robbery with a dangerous weapon, and attempted first-degree murder. On 11 June 2019, the Supreme Court allowed defendant's petition for discretionary review as to additional issues. Heard in the Supreme Court on 4 November 2019.

*Joshua H. Stein, Attorney General, by Mary Carla Babb, Assistant Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Amanda S. Zimmer, Assistant Appellate Defender, for defendant-appellant.*

ERVIN, Justice.

The issues before us in this case arise from defendant's conviction for the first-degree murder of his grandfather on the basis of the felony-murder rule using the attempted murder of his mother with a deadly weapon as the predicate felony. After the conclusion of all of the evidence and the arguments of counsel, the trial court

instructed the jury that it could find defendant guilty of the first-degree murder of his grandfather in the event that it found beyond a reasonable doubt that he killed his grandfather as part of a "continuous transaction" during which he also attempted to murder his mother using either his hands and arms or a garden hoe as a deadly weapon. On appeal, we have been asked to resolve the questions of whether an adult's hands and arms can ever qualify as a deadly weapon for purposes of the felony-murder provisions of N.C.G.S. § 14-17(a) (providing that a defendant can be guilty of first-degree murder on the basis of the felony-murder rule using any "other felony committed or attempted with the use of a deadly weapon" as the predicate felony) and whether the trial court's erroneous jury instruction that the jury could find that defendant attempted to murder his mother using a garden hoe as a deadly weapon prejudiced defendant's chances for a more favorable outcome at trial. *See* N.C.G.S. § 14-17(a) (2019). After careful consideration of the record in light of the applicable law, we affirm the decision of the Court of Appeals, in part; reverse the Court of Appeals' decision, in part; and remand this case to the Superior Court, Rowan County, for a new trial with respect to the issue of defendant's guilt of the murder of his grandfather.

<u>I. Factual Background</u>

<u>A. Substantive Facts</u>

On the evening of 5 November 2013, defendant repaired a ceiling fan at the home of his mother, Sandra Steen, and his grandfather, J.D. Furr. After working on

the fan, defendant's mother handed defendant the bill for a loan that she had secured on his behalf; in response, defendant stated that he would "take care of it." Defendant had a history of borrowing money from his mother and grandfather, both of whom had recently told defendant that they would not lend him any more money. As of 5 November 2013, defendant owed his mother between $4,000 and $6,000, owed his grandfather approximately $500, and had a checking account balance of only $3.64.

As his mother went outside to retrieve certain items from her automobile, defendant, who had followed behind her, told her he was leaving to go to work. After defendant announced his intention to depart, defendant's mother walked to a storage shed behind the house, where she remained for approximately five to ten minutes. At trial, defendant's mother testified that she had no memory of hearing defendant enter his own vehicle or hearing the vehicle leave the premises. While she was in the shed, defendant's mother thought that she heard raised voices. As a result, defendant's mother left the shed for the purpose of checking on her father.

As defendant's mother walked toward the house, she felt someone grab her around her neck with his or her right arm. During her trial testimony, defendant's mother stated that the arm in question felt like defendant's arm and that she had initially assumed that defendant was playing a trick upon her. However, as the grip around her neck tightened, defendant's mother thought, "[n]o[, t]his is somebody trying to kill me." As defendant's mother fought back, "trying to punch or grab whatever [she] could," her attacker placed his or her left hand over her nose and

mouth, at which point everything went black. The next thing that defendant's mother remembered, according to her trial testimony, was that someone was opening her eyelid as she lay on the ground and that she saw defendant's face. At that point, defendant's mother believed that defendant was there for the purpose of helping her.

A number of neighbors testified that they did not see any unfamiliar persons or vehicles in the area that night. After working an 11:00 p.m. to 7:00 a.m. shift, defendant returned to the family home on the following morning. Upon his arrival, defendant approached his mother, whom he realized had been attacked. As a result, defendant called for emergency assistance and laid on the ground with her until paramedics arrived.

At the time that defendant's mother was discovered on the ground, she was suffering from hypothermia and extensive injuries. After being taken to the hospital, defendant's mother was diagnosed with a skull fracture, hemorrhaging of the brain, a mild traumatic brain injury, hypothermia, a cervical neck injury, a collapsed lung, multiple rib fractures, and facial trauma.

According to the paramedics who responded to defendant's call for emergency assistance, defendant's grandfather was dead at the time that they arrived. The paramedics found defendant's grandfather in a face down position near the back door, covered in blood and with a large pool of blood around his head. A garden hoe covered in defendant's grandfather's blood was recovered next to his body. According to the medical examiner, defendant's grandfather died as the result of blunt force injuries

to his head and neck that could have been inflicted using the garden hoe. Defendant's grandfather's wallet, which had blood on it, was found near his body and did not contain the money that was usually kept there. Nothing else appeared to be missing from the property.

Although defendant denied any involvement in the assault upon his mother and the murder of his grandfather both in statements that he made to investigating officers and during his trial testimony, the officers who responded to the scene noticed the presence of scratches upon defendant's arm. Initially, defendant claimed that his mother had scratched him as he lay on the ground beside her while they waited for the paramedics to arrive. As the investigation continued, however, defendant gave ten different explanations concerning the manner in which he had obtained the scratches that had been observed by the investigating officers. Among other things, defendant, at different times, attributed these scratches to his cat, to an injury that he had sustained at work, and to the performance of chores.

The DNA evidence developed from items found at the scene did not connect defendant to the crime. More specifically, the record reflects that defendant's DNA was not found on his grandfather's wallet, in scrapings taken from under his mother's fingernails, or on the garden hoe.

On the day following the assault and murder, while she was still hospitalized, heavily medicated, and just beginning to recover from her traumatic brain injury, defendant's mother spoke with investigating officers. At that time, defendant's

mother told the investigating officers that defendant had left the farm before she was attacked, that the perpetrator "couldn't be [defendant]" because he was taller than her assailant, and that she had been assaulted by someone wearing a ski mask. On the following day, defendant's mother told investigating officers that, "if you're thinking about [defendant as a suspect], then you're barking up the wrong tree," since she did not believe that defendant was capable of committing the assault that had occurred.

After talking with a traumatic brain injury counselor, however, defendant's mother came to the conclusion that defendant had attacked her and testified at trial that that was "when [she] was able to put into place that was [defendant]'s arm coming around [her] neck, that was [defendant] choking [her], and then it was [defendant] knocking [her] out. And then when [her] left eyelid was raised up, that was [defendant]'s face in front of [her]." In addition, defendant's mother told the jury that "[t]here was no [ski] mask" and that she "had been dreaming all kind of crazy dreams laying up there in ICU." Defendant's mother explained during her trial testimony that she had not initially wanted to believe that her son was capable of attacking her and that she had had difficulty remembering specific details about the assault as a result of the brain injury that she had sustained.

## B. Procedural History

On 9 December 2013, a Rowan County grand jury returned bills of indictment charging defendant with the first-degree murder of his grandfather, the attempted

first-degree murder of his mother, and robbing his grandfather with a dangerous weapon. The charges against defendant came on for trial before the trial court and a jury at the 9 January 2017 criminal session of the Superior Court, Rowan County.

At the jury instruction conference, the State requested the trial court to instruct the jury concerning four separate theories on the basis of which defendant could be convicted of first-degree murder: (1) malice, premeditation, and deliberation; (2) felony-murder based upon the predicate felony of robbery with a dangerous weapon; (3) felony-murder based upon the predicate felony of the attempted first-degree murder of defendant's mother; and (4) lying in wait. In support of this request for the delivery of the third of these instructions, the State relied upon the "continuous transaction" doctrine, under which "the [predicate] felony, in this case, which would be attempted first-degree murder occurs before, during, or soon after the murder victim's death as long as that felony, which is the attempted first-degree murder of [defendant's mother], form[s] one continuous transaction" with the actual killing. In objecting to the delivery of the State's requested instructions, defendant's trial counsel argued that the record evidence did not suffice to support defendant's conviction on the basis of either the felony-murder rule or lying in wait. After recognizing that the attempted murder of defendant's mother had to have been committed using a deadly weapon in order for it to qualify as a predicate felony for purposes of N.C.G.S. § 14-17(a), the State asserted that this "deadly weapon" requirement had been satisfied in this case given that "defendant's use of his hands,

possibly feet based on the injuries that [defendant's mother] sustained, and possibly also the use of the garden tool or some other object where she believed she was hit in the back of the head with something hard would constitute a deadly weapon." In response, defendant's trial counsel argued that the record did not contain sufficient evidence to support a jury finding that the garden hoe had been used in connection with the attack upon defendant's mother in light of the fact that, even though the blood of defendant's grandfather had been found on the garden hoe, that object bore no trace of defendant's mother's DNA. In addition, defendant's trial counsel argued that the record did not contain sufficient evidence to support a determination that defendant's hands and arms had been used as a deadly weapon against defendant's mother. During closing arguments, the State asserted that "[w]e know the garden tool is what killed [defendant's grandfather]," but did not mention the possible use of the garden hoe in the attempted murder of defendant's mother.

During its instructions to the jury, the trial court allowed that body to consider all four of the theories of defendant's guilt of first-degree murder that the State had mentioned during the jury instruction conference. In instructing the jury with respect to the issue of defendant's guilt of first-degree murder on the basis of the felony-murder rule using the attempted murder of defendant's mother as the predicate felony, the trial court stated, in pertinent part, that

> to find the defendant guilty of first-degree murder under
> the first-degree felony-murder rule based upon the
> underlying felony of attempted first-degree murder, the
> State must prove four things beyond a reasonable doubt:

First, that the defendant committed the offense of attempted first-degree murder. . . .

Second, that while committing attempted first-degree murder against [his mother], the defendant killed [his grandfather] with a deadly weapon such that it would constitute one continuous transaction.

Third, that the defendant's act was a proximate cause of [his grandfather's] death. . . .

And fourth, that the attempted first-degree murder was committed with the use of a deadly weapon. *The State contends and the defendant denies that the defendant used his hands and/or arms, and or a garden hoe as a deadly weapon.*

A deadly weapon is a weapon which is likely to cause death or serious bodily injury. In determining whether the instrument is a deadly weapon, you should consider its nature, the manner in which it was used and the size and strength of the defendant as compared to the victim.

On 1 February 2017, the jury returned verdicts finding defendant guilty of (1) robbery with a dangerous weapon, (2) the attempted first-degree murder of his mother, and (3) the first-degree murder of his grandfather on the basis of the felony-murder rule using the attempted first-degree murder of his mother as the predicate felony. On the other hand, the jury declined to find defendant guilty of the first-degree murder of his grandfather on the basis of (1) malice, premeditation, and deliberation; (2) the felony-murder rule using robbery with a dangerous weapon as the predicate felony; and (3) lying in wait. After accepting the jury's verdicts and arresting judgment in the case in which defendant had been convicted of the

attempted murder of his mother, the trial court entered judgments sentencing defendant to a term of life imprisonment without the possibility of parole based upon his conviction for first-degree murder and to a consecutive term of 64 to 89 months imprisonment based upon his conviction for robbery with a dangerous weapon. Defendant noted an appeal from the trial court's judgments to the Court of Appeals.

## C. Court of Appeals' Decision

In seeking relief from the trial court's judgments before the Court of Appeals, defendant argued that the trial court had committed prejudicial error by (1) instructing the jury that it could convict defendant of first-degree murder on the basis of the felony-murder rule using the attempted murder of his mother as the predicate felony on the grounds that the record did not contain sufficient evidence to permit the jury to find that defendant had used a garden hoe in the course of attempting to murder his mother; (2) instructing the jury that it could convict defendant of first-degree murder on the basis of the felony-murder rule using the attempted murder of his mother as the predicate felony on the grounds that hands and arms did not constitute a deadly weapon for purposes of N.C.G.S. § 14-17; and (3) excluding expert testimony concerning a medical condition that might have affected the credibility of defendant's mother's testimony that defendant had been her assailant.[1] In rejecting the second of defendant's challenges to the trial court's judgments, the Court of

---

[1] As a result of the fact that the third of defendant's three challenges to the trial court's judgments was unanimously rejected by the Court of Appeals and is not before this Court, we will refrain from discussing it in any detail in this opinion.

Appeals held that the trial court did not err by instructing the jury that defendant's hands and arms could constitute a deadly weapon for purposes of N.C.G.S. § 14-17(a). In reaching this conclusion, the Court of Appeals pointed out that it had "repeatedly held that hands, arms, and feet can constitute deadly weapons in certain circumstances 'depending upon the manner in which they were used and the relative size and condition of the parties,' " citing, among other decisions, *State v. Allen*, 193 N.C. App. 375, 378, 667 S.E.2d 295, 298 (2008), and that this Court had "held that the offense of felony child abuse could serve as the predicate felony for felony-murder where the defendant used his hands as a deadly weapon in the course of committing the abuse," *see State v. Pierce*, 346 N.C. 471, 488, S.E.2d 576, 589 (1997) (stating that, "[w]hen a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons"). *State v. Steen*, 264 N.C. App. 566, 579, 826 S.E.2d 478, 487 (2019). The Court of Appeals further concluded that, given the differences between defendant's size and strength and that of his mother, a reasonable jury could have found that defendant used his hands and arms as deadly weapons in attempting to murder her.[2] In reaching this result, the Court of Appeals "decline[d] [d]efendant's invitation to extend the holding of [this Court in *State v. Hinton*, 361 N.C. 207, 639 S.E.2d 437 (2007),] beyond the

---

[2] According to the Court of Appeals, "[d]efendant was 40 years old and [his mother] was 62 years old" at the time of the attack. In addition, the Court of Appeals noted that defendant "was 5 feet, 11 inches tall and weighed 210 pounds while [defendant's mother] was 5 feet, four inches tall and weighed 145 pounds." *State v. Steen*, 264 N.C. App. 566, 579, 826 S.E.2d 478, 487 (2019).

parameters of the particular context in which it was decided," finding no evidence of any legislative intent to limit the type of weapons that would qualify as deadly weapons for purposes of N.C.G.S. § 14-17(a). *Steen*, 264 N.C. App. at 580, 826 S.E.2d at 487.

In addressing the first of defendant's challenges to the trial court's judgments, the Court of Appeals began by noting that, "although the evidence plainly established that the garden hoe was used to murder [defendant's grandfather], no evidence was presented specifically linking the garden hoe to" the attack upon defendant's mother, so that "evidence was presented in support of only one of the deadly weapon theories instructed on by the trial court — that is, the theory that [d]efendant attempted to murder Sandra with his hands and arms." *Id.* at 582, 826 S.E.2d at 489. On the other hand, acting in reliance upon this Court's decision in *State v. Malachi*, 371 N.C. 719, 821 S.E.2d 407 (2018), the Court of Appeals held that, even if "the reference to the garden hoe was unsupported by the evidence," "any error resulting from this instruction was harmless" given that the State "present[ed] exceedingly strong evidence of defendant's guilt on the basis of a theory that has sufficient support and the State's evidence is neither in dispute nor subject to serious credibility-related questions," quoting *Malachi*, 371 N.C. at 738, 821 S.E.2d at 421, with this evidence including defendant's mother's identification of defendant as her attacker, her extensive injuries, and the jury's "full and fair opportunity to evaluate the reliability of [defendant's mother's] testimony." *Steen*, 264 N.C. App. at 582, 826 S.E.2d at 488–

As a result of its inability to "see how the brief reference to the garden hoe in the jury instructions could have affected the jury's determination as to the credibility of [defendant's mother]'s identification of [d]efendant and, therefore, its verdict," the Court of Appeals found that defendant was not prejudiced by the trial court's erroneous reference to the use of a garden hoe in its instructions concerning the extent to which the jury was allowed to find that defendant had attempted to murder his mother using a deadly weapon. *Id.* at 583, 826 S.E.2d at 489.

In a separate, concurring opinion, Judge Berger opined that "the instruction provided by the trial court regarding the garden hoe was supported by the evidence" produced at trial and was not, for that reason, erroneous. *Steen*, 264 N.C. App. at 583, 826 S.E.2d at 489 (Berger, J., concurring). In Judge Berger's view, the fact that the record contained evidence tending to show that the blows inflicted upon defendant's mother had caused her to suffer a skull fracture and a loss of consciousness meant that the jury could "reasonably infer that [defendant's mother's] injuries were inflicted with a blunt force object" such as the garden hoe. *Id.* at 584, 826 S.E.2d at 490.

In a separate opinion in which he concurred with the Court of Appeals' decision, in part, and dissented from the Court of Appeals' decision, in part, Judge Hunter expressed the opinion that the trial court's erroneous decision to instruct the jury that it could find that defendant attempted to murder his mother with a deadly weapon on the basis of his alleged use of the garden hoe constituted prejudicial error.

*Id*. (Hunter, J., concurring, in part, and dissenting, in part). Arguing in reliance upon our decision in *Malachi*, 371 N.C. at 738, 821 S.E.2d at 421, Judge Hunter noted that reviewing courts are more likely to find an error such as the one at issue here to be harmless in the event that the State presents "strong evidence of [defendant's] guilt" while stating that the State's evidence was "far from conclusive as to [d]efendant's guilt." *Id*. at 584–85, 826 S.E.2d at 490. Among other things, Judge Hunter concluded that defendant's mother's credibility was subject to serious question given that she had provided "widely conflicting" statements concerning the circumstances surrounding the attack that had been made upon her during the course of the investigation. *Id*. In addition, Judge Hunter opined that the testimony of defendant's mother identifying defendant as the perpetrator of the assault that had been committed upon her was of substantial importance to the State's case given the absence of any DNA evidence linking defendant to the attempted murder of his mother and the murder of his grandfather. *Id*. at 585, 826 S.E.2d at 490. As a result, Judge Hunter believed that defendant was entitled to a new trial with respect to the murder charge. *Id*.

Defendant noted an appeal to this Court based upon Judge Hunter's dissent. On 11 June 2020, we allowed defendant's petition seeking discretionary review with respect to the additional issue of whether the trial court erred by allowing the jury to treat hands and arms as a deadly weapon for purposes of N.C.G.S. § 14-17.

## II. Substantive Legal Analysis

### A. Hands and Arms as a Deadly Weapon

In seeking to persuade this Court to overturn the Court of Appeals' decision that hands and arms can be a deadly weapon for purposes of N.C.G.S. § 14-17(a), defendant asserts that "[a]llowing hands and arms to be a deadly weapon under N.C.G.S. § 14-17(a) vastly and improperly expands the circumstances which could support a conviction for felony-murder" under North Carolina law. In support of this argument, defendant points out that "not all crimes can be aggravated based on the alleged use of hands and/or arms as a deadly weapon," *citing Hinton*, 361 N.C. at 211–12, 639 S.E.2d at 440 (reasoning that "the General Assembly intended to require the State to prove that a defendant used an external dangerous weapon before conviction under the [robbery with a dangerous weapon] statute is proper"). As a result, defendant argues that, given the General Assembly's decision in 1977 to amend N.C.G.S. § 14-17(a) for the purpose of limiting the reach of the felony-murder rule so that it only encompassed certain enumerated felonies and other felonies perpetrated with the "use of a deadly weapon," the legislative intent would be "thwarted by not requiring an external dangerous weapon" as a prerequisite for a conviction under the "catch-all" provision of the statute. In addition, defendant contends that hands and arms are inherently different than an external deadly weapon on the theory that a perpetrator would not receive the same "boost of confidence" from the use of his own appendages that he would receive by carrying a

firearm or some other external weapon. Finally, defendant argues that our prior decision in *Pierce* should either be overruled or limited to cases in which felonious child abuse serves as the predicate felony for purposes of the felony-murder rule.

In seeking to persuade us to uphold the Court of Appeals' decision with respect to the issue of whether hands and arms can serve as deadly weapons for purpose of the statutory version of the felony-murder rule embodied in N.C.G.S. § 14-17(a), the State begins by noting North Carolina's lengthy history of leaving the issue of whether a particular weapon qualifies as "deadly" for the jury's consideration. *See State v. Joyner*, 295 N.C. 55, 64–65, 243 S.E.2d 367, 373 (1978) (holding that an instrument's "allegedly deadly character" is a question "of fact to be determined by the jury"). In addition, the State cites decisions, such as *State v. Brunson*, 180 N.C. App. 188, 636 S.E.2d 202 (2006), *aff'd per curiam*, 362 N.C. 81, 653 S.E.2d 144 (2007), for the proposition that this Court has long "recognized that under certain circumstances, hands and other body parts may be deadly weapons for purposes of proving the deadly weapon element of assault offenses perpetrated with a deadly weapon." The State argues that this Court should reject defendant's invitation to overrule *Pierce* on the grounds that it "is now well-established [law] in our appellate courts' jurisprudence," citing four subsequent cases that rely, in part, upon the reasoning utilized in *Pierce*. *See, e.g., State v. Jones*, 353 N.C. 159, 168, 538 S.E.2d 917, 925 (2000). In the State's view, this Court's holding in *Pierce* is not limited to cases in which the predicate felony for felony-murder is child abuse; instead, the State

contends that the logic of *Pierce* is applicable in any case in which the weapon "is something not inherently deadly," in which event the issue of whether a particular item constitutes a deadly weapon is a question for the jury "based upon the manner of usage and a victim's characteristics—age, size, etc.—relative to the defendant's." *See State v. Lang*, 309 N.C. 512, 525–26, 308 S.E.2d 317, 324 (1983) (holding that the trial court did not err by instructing the jury that it could find the defendant's hands or feet to be deadly weapons in a case in which two adult males kicked an adult female victim with their feet, hit her with their hands and a bat, and cut her with a knife).

The proper resolution of the issue of whether the term "deadly weapon" as contained in N.C.G.S. § 14-17(a) includes an adult defendant's hands, arms, fists, or feet when used against another adult requires us to decide an issue of statutory construction. In attempting to ascertain the meaning of a particular statutory provision, "we look first to the language of the statute itself." *Walker v. Bd. of Trs. of N.C. Loc. Gov'tal Emps. Ret. Sys.*, 348 N.C. 63, 65, 499 S.E.2d 429, 430 (1998) (quoting *Hieb v. Lowery*, 344 N.C. 403, 409, 474 S.E.2d 323, 327 (1996)). In the event that the relevant statutory language is unambiguous, the statute should be interpreted in accordance with its plain meaning. *See Lemons v. Old Hickory Council, Boy Scouts of Am., Inc.*, 322 N.C. 271, 276, 367 S.E.2d 655, 658 (1988). On the other hand, in the event that the relevant statutory language is ambiguous, "judicial construction must be used to ascertain the legislative will," which must be carried out "to the fullest extent." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134,

136–37 (1990). "As with any other statute, the legislative intent controls the interpretation of a criminal statute." *State v. Jones*, 358 N.C. 473, 478, 598 S.E.2d 125, 128 (2004).

"[W]hen the General Assembly fail[s] to intervene in light of a long-standing judicial practice," the principle of legislative acquiescence becomes relevant. *Id.* at 483, 598 S.E.2d at 131 (finding that, had the General Assembly wished to change the crime of possession of cocaine from a felony to a misdemeanor, "it could have addressed the matter during the course of these many years" and that, in light of its failure to do so, "it is clear that the legislature has acquiesced in the practice of classifying the offense of possession of cocaine as a felony"). Although legislative inaction should not, standing alone, be treated as dispositive, "[t]he failure of a legislature to amend a statute which has been interpreted by a court is some evidence that the legislature approves of the court's interpretation." *Young v. Woodall*, 343 N.C. 459, 462–63, 471 S.E.2d 357, 359 (1996).

This Court and the Court of Appeals have a lengthy history of using the doctrine of legislative acquiescence in interpreting criminal statutes. In *State v. Gardner*, for example, this Court held that the crimes of breaking or entering and felonious larceny were separate offenses in light of the fact that the appellate courts in North Carolina had long treated them as distinct, 315 N.C. 444, 462, 340 S.E.2d 701, 713 (1986), on the theory that, if "punishment of both crimes in a single trial [had] not been intended by our legislature, it could have addressed the matter during

the course of these many years," *id*. at 462–63, 340 S.E.2d at 713.  The same logic supports the conclusion that hands, arms, feet, and other appendages can be deadly weapons for purposes of the statutory felony-murder rule embodied in N.C.G.S. § 14-17(a).

As a general proposition, a "deadly weapon" as that term is used in North Carolina jurisprudence is one that is "likely to produce death or great bodily harm under the circumstances of its use," with the issue of whether a particular weapon is or is not deadly being "one of fact to be determined by the jury" in the event that it "may or may not be likely to produce [death], according to the manner of its use, or the part of the body at which the blow is aimed." *Joyner*, 295 N.C. at 64–65, 243 S.E.2d at 373 (citations omitted).  A defendant's hands, arms, feet, or other appendages may well, under certain circumstances, be "likely to produce death or great bodily harm," as this Court and the Court of Appeals have held in a number of different contexts.[3]

In *Pierce*, for example, this Court upheld a defendant's conviction for first-degree murder on the basis of the felony-murder rule using felonious child abuse as

---

[3] As we understand defendant's brief, he has not contended before this Court that, in the event that hands, arms, legs, and other appendages can ever serve as a deadly weapon for purposes of the statutory felony-murder rule set out in N.C.G.S. § 14-17(a), the evidence fails to support a finding that his hands and arms were deadly weapons in light of the manner in which they were used during his alleged attempt to murder his mother.  For that reason, the only issue before us at this time is the extent to which, in the abstract, hands and arms can constitute a deadly weapon for purposes of North Carolina's current version of the felony-murder rule rather that whether the evidence supported a finding that his hands and arms as used at the time of his alleged assault upon his mother were deadly weapons as a matter of fact.

the predicate felony in a case in which the defendant caused a child's death by shaking her with his hands. 346 N.C. at 493, 488 S.E.2d at 589 (stating that, "[w]hen a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons"). Similarly, the Court of Appeals has held, in the felony-murder context, that a defendant's hands, arms, feet, and other appendages can be a deadly weapon, with the issue of whether the weapon in question was or was not actually deadly being a question of fact for the jury. *State v. Frazier*, 248 N.C. App. 252, 261, 790 S.E.2d 312, 319 (2016) (holding that the trial court did not err by allowing the jury to determine whether the "killing took place while the accused was perpetrating or attempting to perpetrate felonious child abuse with the use of a deadly weapon," which, in that instance, was his hands); *State v. Krider*, 145 N.C. App. 711, 712, 550 S.E.2d 861, 862 (2001) (upholding a defendant's conviction for first-degree murder based upon the felony-murder rule in a case in which the defendant caused the death of a child in the course of "committing felonious child abuse with the use of her hands as a deadly weapon").

In the same vein, the Court of Appeals has repeatedly held, unlike appellate courts in other states, that a defendant's hands and feet can be deadly weapons sufficient to support a defendant's conviction for assault with a deadly weapon in violation of N.C.G.S. § 14-32. *See Allen*, 193 N.C. App. at 378, 667 S.E.2d at 298 (2008) (holding that a defendant's "hands may be considered deadly weapons . . . depending upon the manner in which they were used and the relative size and

condition of the parties"); *State v. Harris*, 189 N.C. App. 49, 59–60, 657 S.E.2d 701, 708–709 (2008) (holding that the issue of whether "an assailant's hands and feet are used as deadly weapons is a question of fact to be determined by the jury"); *State v. Rogers*, 153 N.C. App. 203, 211, 569 S.E.2d 657, 663 (2002) (holding that hands and fists "may be considered deadly weapons, given the manner in which they were used and the relative size and condition of the parties involved"); *State v. Hunt*, 153 N.C. App. 316, 319, 569 S.E.2d 709, 710–11 (2002) (holding that the jury "was properly allowed to determine the question of whether defendant's hands and feet constituted deadly weapons"); *State v. Grumbles*, 104 N.C. App. 766, 769, 411 S.E.2d 407, 409 (1991) (describing "this [as] a case where defendant's fists could be considered deadly weapons"); *State v. Jacobs*, 61 N.C. App. 610, 611, 301 S.E.2d 429, 430 (1983) (holding that, in a case in which a 210 pound male defendant hit a sixty-year-old female victim with his fists, "defendant's fists could have been a deadly weapon"). As a result, given the virtually uninterrupted line of appellate decisions from this Court and the Court of Appeals interpreting the reference to a "deadly weapon" in N.C.G.S. § 14-17(a) to encompass the use of a defendant's hands, arms, feet, or other appendages, so that the language used in the relevant statutory provision has an established meaning in North Carolina law, and the fact that the General Assembly has not taken any action tending to suggest that N.C.G.S. § 14-17(a) should be interpreted in a manner that differs from the interpretation deemed appropriate in this line of decisions, it would be reasonable to assume that, given the use of an expression that has an established

meaning and the fact that the General Assembly has failed "to intervene in light of [this] long-standing judicial practice," *Jones*, 358 N.C. at 483, 598 S.E.2d at 131, the General Assembly intended for the language of the statutory felony-murder rule set forth in N.C.G.S. § 14-17(a) to be interpreted in the manner deemed to be appropriate by the Court of Appeals in this case.

In seeking to persuade us to reach a different result in this case, defendant argues, among other things, that our decision in *Pierce* should either be overruled or, in the alternative, that it should be limited to situations involving the abuse of small children. In support of this argument, defendant asserts that there is a categorical difference between child and adult victims, with the former being peculiarly susceptible to serious injury or death as a result of the use of hands, arms, feet, or other appendages while the latter are not. Aside from the fact that acceptance of defendant's argument would be inconsistent with the manner in which this Court has defined the expression "deadly weapon" for many years, *see, e.g., Joyner*, 295 N.C. at 64–65, 243 S.E.2d at 373; *State v. Hales*, 344 N.C. 419, 426, 474 S.E.2d 328, 332 (1996); *State v. Peacock*, 313 N.C. 554, 563, 330 S.E.2d 190, 196 (1985), and the absence of any basis for the making of such a distinction in either the relevant statutory language or in the decisions, such as *Pierce*, allowing the jury to find that a deadly weapon had been used in cases in which an adult defendant used his or her hands, arms, feet, or some other appendage in the course of assaulting a smaller or weaker adult, *see Allen*, 193 N.C. App. at 378, 667 S.E.2d at 298; *Harris*, 189 N.C.

App. at 59–60, 657 S.E.2d at 708–09; *Rogers*, 153 N.C. App. at 211, 569 S.E.2d at 663; *Hunt*, 153 N.C. App. at 318–19, 569 S.E.2d at 710–11; *Grumbles*, 104 N.C. App. at 770, 411 S.E.2d at 410; *Jacobs*, 61 N.C. App. at 611, 301 S.E.2d at 430, we see no reason to overrule *Pierce* or to adopt the restrictive interpretation of that decision for which defendant advocates. As a result, we decline defendant's invitation to limit the logic of *Pierce* to felony-murder cases arising from the commission of felonious child abuse using the defendant's hands, arms, legs, or another appendage as the necessary deadly weapon.

Similarly, defendant argues that the logic of our decision in *Hinton*, 361 N.C. at 207, 639 S.E.2d at 437, shows that the expression "deadly weapon" can mean different things when used in different statutory provisions and that we should adopt a felony-murder-specific interpretation of N.C.G.S. § 14-17(a) in this case. In *Hinton*, we held that the reference to "any firearms or other dangerous weapon, implement or means" as used in N.C.G.S. § 14-87(a) did not encompass the use of a defendant's hands, *id.* at 210, 639 S.E.2d at 439, with the Court having reached this result on the grounds that N.C.G.S. § 14-87 was intended to provide a "more severe punishment when the robbery is committed with the 'use or threatened use of firearms or other dangerous weapons' " than when the defendant committed common law robbery, which did not involve the use of such implements. *Id.* at 211–12, 639 S.E.2d at 440. We are not, however, persuaded that the logic upon which the Court relied in *Hinton* has any application to this case given that we have been unable to identify anything

in the language in or legislative intent underlying N.C.G.S. § 14-17(a) that tends to suggest that its reference to a "deadly weapon" should be treated any differently than the way in which that expression has normally been treated in North Carolina criminal jurisprudence.

Finally, the construction of the relevant statutory language that we believe to be appropriate in this case does not create a risk that every killing perpetrated with the use of a the defendant's hands, arm, legs, or other appendages will necessarily come within the ambit of the statutory felony-murder rule set out in N.C.G.S. § 14-17(a) or otherwise thwart the General Assembly's attempt to limit the scope of the felony-murder rule by confining the availability of the felony-murder rule to unenumerated felonies committed with the use of a deadly weapon. On the contrary, under the established law in North Carolina, the extent to which hands, arms, legs, and other appendages can be deemed deadly weapons depends upon the nature and circumstances of their use, including, but not limited to, the extent to which there is a size and strength disparity between the perpetrator and his or her victim. Similarly, the fact that something more than a killing with hands, arms, legs, or other bodily appendages must be shown in order to satisfy the requirements of the felony-murder rule set out in N.C.G.S. § 14-17(a) shows that the decision that we make in this case will not have the effect of undoing the limitations upon the availability of the felony-murder rule that the General Assembly intended when it enacted the current version of the relevant statutory language, particularly given its consistency

with the established definition of that term contained in our decisions and those of the Court of Appeals.

As a result, given that this Court and the Court of Appeals have held that bodily appendages such as a defendant's hands and arms can, depending upon the manner in which and the circumstances under which they are used, constitute deadly weapons in applying a wide variety of statutory provisions and given that, if the General Assembly intended to exclude hands, arms, feet, and other bodily appendages from the definition of "deadly weapon" used for purposes of N.C.G.S. § 14-17(a), it has had ample opportunity to do so without ever having acted in that manner, we hold that there is no reason for the statutory reference to a "deadly weapon" contained in N.C.G.S. § 14-17(a) to have anything other than its ordinary meaning. On the contrary, a decision excluding arms, hands, feet, and other appendages from the definition of a "deadly weapon" for purposes of the statutory felony-murder rule enumerated in N.C.G.S. § 14-17(a) would create unnecessary confusion in our State's criminal law. As a result, we affirm the Court of Appeals' decision that the trial court did not err by instructing the jury that it could find that defendant attempted to murder his mother with a deadly weapon based upon the use of his hands and arms.

## B. Prejudicial Effect of the Garden Hoe Instruction

In seeking to persuade us that the trial court's instruction that the jury was entitled to find that defendant attempted to murder his mother using a garden hoe

as a deadly weapon constituted prejudicial error,[4] defendant begins by noting that, in order to demonstrate the prejudicial nature of the trial court's error, he needed to show the existence of a "reasonable possibility" that "a different result would have been reached at the trial" in the absence of that error. *Malachi*, 371 N.C. at 738, 821 S.E.2d at 421. Defendant contends that he made the necessary showing of prejudice given that defendant's DNA had not been found on the garden hoe, on his grandfather's wallet, or in the scrapings taken from beneath his mother's fingernails and that no blood had been found in defendant's car or on any item of his clothing.[5] In addition, defendant contends that, "given the various widely conflicting pre-trial statements that [his mother] gave—all but one of which flatly denied that [d]efendant was her assailant—her testimony clearly raised . . . the sort of serious credibility questions contemplated by the Supreme Court in *Malachi*" quoting *Steen*, 264 N.C. App. at 584–85, 826 S.E.2d at 490 (Hunter, J., dissenting). In defendant's view, the Court of Appeals erred by determining that the identification testimony provided by

---

[4] As an aside, we note that the issue of the correctness of the Court of Appeals' determination that the trial court's instruction that the jury could find that defendant attempted to murder his mother using the garden hoe lacked sufficient evidentiary support is not before us given that the State did not seek review by this Court of the Court of Appeals' decision with respect to that issue.

[5] In addition, defendant claims that an allele associated with a third party was found in fingernail scrapings taken from his mother. However, since the undisputed record evidence tended to show that the DNA analyst who testified on behalf of the State was unable to determine whether the allele came from a third party or was simply an artifact produced by the DNA amplification process and that it would have been possible for DNA evidence derived from a paramedic or another similar individual to be found in the fingernail scrapings taken from defendant's mother, we do not consider this aspect of defendant's argument in our prejudice analysis.

his mother constituted "exceedingly strong evidence" of his guilt given the absence of any physical evidence linking him to the commission of the crimes with which he had been charged and the existence of serious concerns about the credibility of the identification testimony provided by his mother.

The State, on the other hand, argues that the "challenged jury instruction" did not constitute prejudicial error given that "[t]he instruction as given simply stated two of the possible implements, used alone or in combination, the State was contending defendant used as a deadly weapon" and that the challenged instruction correctly asserted "that the State was contending defendant used his hands and/or arms and or a garden hoe as a deadly weapon." In addition, the State contends that, even if the trial court's reference to the garden hoe was erroneous, "the evidence at trial overwhelming[ly] established defendant used a deadly weapon in perpetrating the predicate felony," so that the jury would have reached the same conclusion in the absence of the challenged jury instruction. As support for this assertion, the State relies upon the testimony of defendant's mother and the evidence concerning the extensive injuries that she sustained during the assault that was made upon her.

In addition, the State contends that the Court of Appeals correctly applied *Malachi* to the facts of this case. According to the State, the application of the traditional harmless error test that this Court deemed to be appropriate in *Malachi* necessitates a conclusion that defendant had failed to show the existence of a reasonable possibility that the jury would have reached a different result in the

absence of the delivery of the unsupported instruction relating to the garden hoe given that "the identity of the perpetrator was the most contested issue at trial" and, in the face of conflicting evidence, "the jury believed [defendant's mother] when she identified defendant as the person who attacked her." In addition, the State argued that it had elicited strong evidence of defendant's guilt at trial, with this evidence including the fact that defendant's mother ultimately, and reluctantly, testified against him in spite of the fact that she had initially refused to believe that her own son was capable of attacking her; the inconsistent explanations that defendant gave for the scratches on his arms; and the fact that defendant had both an opportunity and a motive for attacking his mother and his grandfather.

As a result of the fact that the State does not dispute defendant's contention that he properly preserved his challenge to the trial court's instruction that the jury could consider the use of the garden hoe in determining whether defendant attempted to murder his mother with a deadly weapon,[6] we evaluate the prejudicial effect of the

---

[6] We are not persuaded by the State's suggestion that the trial court's deadly weapon instruction simply listed possible choices for the identity of the deadly weapon that the jury had to find in order to convict defendant of the first-degree murder of his grandfather on the basis of the felony-murder rule using the attempted murder of defendant's mother as the predicate felony. After informing the jury that it had to find that defendant attempted to murder his mother using a deadly weapon in order to find defendant guilty of the first-degree murder of his grandfather, the trial court indicated that the State contended that the deadly weapon that defendant used in attempting to murder his mother was either his own hands and arms or the garden hoe. Taken in context, we believe that the jury could have only used the trial court's reference to the use of defendant's hands and arms or a garden hoe as a recitation of the available bases for a finding that defendant attempted to murder his mother using a deadly weapon rather than the mere statement of a non-exclusive list of possible deadly weapons.

delivery of this instruction using our traditional harmless error standard, *State v. Lawrence*, 365 N.C. 506, 512, 723 S.E.2d 326, 330 (2012), which requires "the defendant [to] show 'a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.'" *Id.* at 513, 723 S.E.2d at 331 (quoting N.C.G.S. § 15A-1443(a) (2009)). In conducting the required prejudice analysis, a reviewing court "should not find the error harmless" if it is unable to conclude "that the jury verdict would have been the same absent the error." *State v. Bunch*, 363 N.C. 841, 845, 689 S.E.2d 866, 869 (2010) (quoting *Neder v. United States*, 527 U.S. 1, 19, 119 S. Ct. 1827, 1838, 144 L. Ed. 2d 35 (1999)).

In *Malachi*, we upheld the use of traditional harmless error analysis in evaluating the extent to which the defendant's case was prejudiced by the delivery of an erroneous jury instruction which allowed the jury to convict the defendant of possession of a firearm by a felon on the basis of both actual and constructive possession despite the fact that the record contained no evidence that the defendant constructively possessed the firearm in question. 371 N.C. at 721-22, 731, 821 S.E.2d at 410, 416. In holding that the trial court's unsupported constructive-possession instruction constituted harmless error, we stated that:

> instructional errors like the one at issue in this case are exceedingly serious and merit close scrutiny to ensure that there is no 'reasonable possibility' that the jury convicted the defendant on the basis of such an unsupported legal theory. However, in the event that the State presents exceedingly strong evidence of defendant's guilt on the

> basis of a theory that has sufficient support and the State's evidence is neither in dispute nor subject to serious credibility-related questions, it is unlikely that a reasonable jury would elect to convict the defendant on the basis of an unsupported legal theory.

*Id.* at 738, 821 S.E.2d at 421. As a result, the prejudice analysis that we are required to conduct in this case must focus upon the relative strength of the State's case in light of the strength of the countervailing evidence available to defendant, including both any substantive evidence that defendant may have elicited and any credibility-related weaknesses that may exist in the evidence tending to show defendant's guilt, with the ultimate question being whether there is a "reasonable possibility" that the outcome at trial would have been different in the event that the trial court's error had not been committed.

After carefully reviewing the record, we conclude that there is a reasonable possibility that the jury would have refrained from convicting defendant of the first-degree murder of his grandfather on the basis of the felony-murder rule using the attempted murder of his mother with a deadly weapon as the predicate felony in the absence of the trial court's erroneous instruction referring to the garden hoe as a deadly weapon. In order to avoid reaching this conclusion, we would be required to hold that the State's evidence that defendant killed his grandfather as part of a continuous transaction in which he also attempted to murder his mother using his hands and arms as a deadly weapon was so sufficiently strong that no reasonable possibility exists under which the jury would have done anything other than convict

defendant of first-degree murder on the basis of that legal theory. We are unable to make such an inference given the facts contained in the present record.

As an initial matter, we note that the evidence concerning the issue of whether defendant was the actual perpetrator of the assault upon his mother and the killing of his grandfather was in sharp dispute, a fact that the jury's eventual verdict does nothing to change. Aside from the fact that defendant consistently denied having committed the offenses with which he had been charged in his conversations with investigating officers, he maintained his innocence when he took the witness stand and testified at trial. Defendant's denials of guilt were bolstered by the fact that the record was devoid of any physical evidence tending to support the contention that he was the perpetrator of the crimes that he had been charged with committing. Finally, the conflicting nature of the statements that defendant's mother made to investigating officers concerning her ability to identify the person who had assaulted her provided an adequate basis for a reasonable jury to discount the credibility of the identification that she delivered at trial. As a result, while the record does, as the State contends, contain substantial evidence tending to show that defendant was guilty of attempting to murder his mother and killing his grandfather, including substantial evidence of his motive to commit the crimes in question and his inconsistent explanations for the scratches on his arms, we are unable to say that the State's evidence with respect to the issue of defendant's identity as the perpetrator of

the murder of his grandfather was so strong that a reasonable jury could not have reached a contrary conclusion.

Even more importantly, the evidence concerning the extent to which defendant's hands and arms, as used during the alleged killing of his mother, constituted a deadly weapon was in significant dispute as well. As we noted earlier in this opinion, the trial court did not peremptorily instruct the jury that defendant's hands and arms were deadly weapons per se; instead, the trial court required the jury to make this determination based upon the nature and manner of their use and the other relevant surrounding circumstances. Although the size and strength differential between defendant and his mother was, as the Court of Appeals found, sufficient to permit a determination that defendant's hands and arms constituted a deadly weapon for purposes of this case, the differences in size and strength between defendant and his mother as revealed in the record evidence were not so stark as to preclude a reasonable jury from concluding that defendant's hands and arms were not deadly weapons. In the same vein, the nature and extent of the injuries that were inflicted upon the mother does not suffice to support a finding of harmlessness given that such a determination overlooks the necessity for the State to show a disparity in size and strength between the killer and the victim in addition to the infliction of fatal injuries and given that a contrary determination would effectively render hands and arms a deadly weapon in all instances in which death results as a result of their use. In the event that the jury decided to conclude, as we believe that it reasonably could

have, that defendant's hands and arms were not used as a deadly weapon during his alleged attempt to murder his mother, it would have been compelled to refrain from finding that defendant was guilty of the first-degree murder of his grandfather on the basis of the felony-murder rule even if it found that he was the perpetrator of that killing. As a result, we hold that the trial court's instruction concerning the use of the garden hoe as a deadly weapon during defendant's alleged attempt to murder his mother constituted prejudicial error necessitating a new trial in the case in which defendant was convicted of murdering his grandfather.[7]

### III. Conclusion

Thus, for the reasons set forth above, we hold that the Court of Appeals correctly held that the trial court did not err by instructing the jury that, in light of the surrounding facts and circumstances, it could find that defendant's hands and arms constituted a deadly weapon for purposes of the felony-murder provisions of N.C.G.S. § 14-17(a). On the other hand, we also hold that there was a reasonable possibility that, had the trial court refrained from instructing the jury in such a manner as to allow it to conclude that defendant attempted to murder his mother using the garden hoe as a deadly weapon, the outcome at defendant's trial for the murder of his grandfather would have been different and that the Court of Appeals

---

[7] In view of the fact that defendant has not contended that the trial court's erroneous instruction concerning the jury's ability to find that defendant's alleged use of a garden hoe in attempting to murder his mother had no bearing upon the appropriateness of defendant's conviction for the attempted murder of his mother or the robbery of his grandfather, the trial court's judgment in the robbery case and the jury's verdict in the attempted murder case remain undisturbed.

erred by reaching a contrary result.  As a result, the Court of Appeals' decision is affirmed, in part, and reversed, in part, with this case being remanded to the Court of Appeals for further remand to the Superior Court, Rowan County, for a new trial in the case in which defendant was convicted of murdering his grandfather.

AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice NEWBY concurring in part and dissenting in part.

While I agree with the majority that defendant's hands and arms constitute deadly weapons in this case, I disagree that the instruction regarding the garden hoe resulted in prejudicial error. At trial the State's evidence clearly established that the garden hoe was used to murder the grandfather, but the evidence did not specifically link the garden hoe to the attack on Sandra, defendant's mother. Rather, the State's theory was that defendant used his hands and arms in an attempt to murder his mother. As stated by the Court of Appeals,

> Sandra testified that her attacker grabbed her from behind and tightly wrapped his right arm around her neck before placing his left hand over her nose and mouth. A struggle then ensued between Sandra and her attacker until she lost consciousness. The injuries Sandra sustained included a skull fracture, multiple rib fractures, and a collapsed lung. Such testimony clearly constitutes substantial evidence to support an instruction that hands and arms were used as weapons during the attack on her.

*State v. Steen*, 264 N.C. App. 566, 582, 826 S.E.2d 478, 489 (2019). The evidence of skull and rib fractures supports the theory that the attacker used a weapon, like the garden hoe; however, there was no specific evidence linking the garden hoe to the attack. As determined by the Court of Appeals, the evidence presented supported only one of the deadly weapon theories the trial court instructed on—hands and arms as deadly weapons—but that theory was amply supported by the evidence. *See id.* "[I]t is unlikely that a reasonable jury would elect to convict the defendant on the basis of

an unsupported legal theory," *State v. Malachi*, 371 N.C. 719, 738, 821 S.E.2d 407, 421 (2018), even though the jury instructions included both the garden hoe and hands and arms as deadly weapons for the attempted murder charge of Sandra. As a result, the instruction given on garden hoe, even if erroneous, did not prejudice defendant.

The real issue at trial was the identity of the perpetrator, not which weapon caused which of the injuries. Sandra identified defendant as her attacker, and the jury evaluated the reliability of her testimony in light of all the evidence. When the jury found defendant guilty it found credible Sandra's identification of defendant as the attacker. Because the ultimate issue at trial concerned defendant's identity as the perpetrator, the reference to the garden hoe in the jury instructions did not influence the jury's decision to find Sandra's testimony credible. Even if the garden hoe instruction represented a different theory of the underlying crime of attempted murder, any error resulting from it was harmless because that theory was not supported by the evidence at trial. Defendant cannot show a reasonable possibility that the jury would have reached a different result absent the erroneous instruction, and his convictions should be upheld. I respectfully concur in part and dissent in part.

Justice MORGAN joins this opinion.

Justice EARLS concurring in result only in part and dissenting in part.

To find Mr. Steen guilty of felony murder on the theory adopted by the jury, they were required to conclude that the evidence proved he attempted to murder his mother using a deadly weapon. The jury was instructed that it could find that he used either a garden hoe or his hands and arms as deadly weapons. There was no evidence presented at trial from which a jury could conclude that Mr. Steen used a garden hoe to harm his mother. *State v. Steen*, 264 N.C. App. 566, 582, 826 S.E.2d 478, 489 (2019). The majority holds today that (1) a jury can properly consider a person's hands, arms, feet, or other body parts to be deadly weapons for purposes of the felony murder statute, but (2) that the inclusion of the garden hoe instruction was not harmless error and warrants a new trial. With regard to the second holding, while I do not concur in the majority's analysis relying on our decision in *State v. Malachi*, 371 N.C. 719, 821 S.E.2d 407 (2018), I do agree that the instruction regarding the garden hoe was error warranting a new trial.

However, in its first holding the Court abdicates its role as a steward of this state's law and turns upside down the principle of stare decisis. Ignoring our own precedents and disregarding every reliable indicator of legislative intent, the majority decides to follow precedent from the Court of Appeals because, without intervention from either this Court or the General Assembly, the Court of Appeals has continued

to follow its own precedent. Because I read the felony murder statute's deadly weapon requirement not to include a defendant's hands and arms, I respectfully dissent.

Subsection 14-17(a) of the General Statutes of North Carolina defines felony murder, punishable by death or life imprisonment without parole, as a murder that is "committed in the perpetration or attempted perpetration of" certain enumerated felonies or "other felony committed or attempted with the use of a deadly weapon." N.C.G.S. § 14-17(a) (2019). Our General Statutes do not define the term "deadly weapon." Rather, the definition derives from this Court's case law. A "deadly weapon" is "any article, instrument or substance which is likely to produce death or great bodily harm." *State v. Sturdivant*, 304 N.C. 293, 301, 283 S.E.2d 719, 725 (1981). While the Court has held that other generally innocuous items may be considered deadly weapons depending on "the relative size and condition of the parties and the manner in which [they are] used," *State v. Archbell*, 139 N.C. 537, 538, 51 S.E. 801, 801 (1905), and we have held that an adult defendant's hands used against a child victim may be considered deadly weapons, *State v. Pierce*, 346 N.C. 471, 488 S.E.2d 576 (1997), we have never specifically addressed whether an adult's hands or other body part, wielded against another adult, may be considered deadly weapons for purposes of the felony murder rule.

The felony murder rule derives from English common law and was inherited by American courts. Nelson E. Roth & Scott E. Sundby, *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L. Rev. 446, 458 (1985) [hereinafter

Roth & Sundby, *The Felony Murder Rule*]. Since its inception in the United States, the felony murder rule remains in existence, although subject to modern limitations. 2 Wharton's Criminal Law § 147 (15th ed.). The rule originally punished defendants by requiring the imposition of the death penalty for any death that resulted during the attempted or successful perpetration of a felony. Roth & Sundby, *The Felony Murder Rule* at 450.

However, as the death penalty began to be eliminated for most felonies, revisions to felony murder statutes were made, ultimately leading to fewer crimes that constitute predicate offenses for a conviction under the felony murder rule. 2 Wharton's Criminal Law § 149. Eventually, England eliminated the felony murder rule, and jurisdictions within the United States began to place limitations on the application of the rule. *Id.* However, today, most states' felony murder rules contain the same pattern as the 1794 Pennsylvania felony murder statute, which states that "[a]ll murder . . . which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary shall be deemed murder in the first degree." 2 Wharton's Criminal Law § 147 (second alteration in original) (citation omitted).

The doctrine of felony murder includes unintended homicides that occur during the commission of a felony, the purpose of which is to protect innocent lives by deterring the commission of felonies in a dangerous or violent manner. Jerome Michael & Herbert Wechsler, *A Rationale of the Law of Homicide: I*, 37 Colum. L.

Rev. 701, 714–15 (1937). The rationale behind the felony murder rule is that certain crimes carry a cognizable risk that death may occur from their commission. *Id.* Therefore, if death does result during such a crime, the perpetrator is responsible for the death because the death was a reasonably foreseeable consequence of the action. *Id.*

A killing is considered to have occurred during the perpetration of a felony if it occurred within the "res gestae" of the felony. *State v. Squire*, 292 N.C. 494, 512, 234 S.E.2d 563, 573 (1977) (quoting 58 A.L.R.3d 851 (originally published in 1974)). This means that the killing was close in time and distance to the felony and without a break in the chain of events from the perpetration of the felony to the time of the homicide. *See State v. Ray*, 149 N.C. App. 137, 146, 560 S.E.2d 211, 217–18 (2002). Commonly, the felony murder statute contains certain enumerated felonies in which a homicide that occurs during its perpetration would result in first-degree murder. 2 Wharton's Criminal Law § 148. Usually, these enumerated felonies involve an element of danger or violence that implies malice, and that malice may be transferred to an unintended homicide. *Id.* "Consistent with this thinking, most courts require, for the felony-murder rule to be applicable in the case of an unenumerated felony, that the felony be inherently dangerous." *Id.*

In North Carolina, prior to 1977, any inherently dangerous felony could support a conviction under the felony murder rule. *See State v. Streeton,* 231 N.C. 301, 305, 56 S.E.2d 649, 652 (1949) (discussing the previous felony murder rule, which

defined felony murder as a homicide resulting from the commission or attempted commission of certain enumerated felonies or any other inherently dangerous felony). However, the General Assembly revised this state's felony murder statute in 1977 to limit the felony murder rule's application to the felonies enumerated in the statute and unenumerated felonies only when perpetrated with the use of a deadly weapon. N.C.G.S. § 14-17(a) (2019). Thus, today in North Carolina, when the felony murder rule is applied to an unenumerated felony, that felony must have been committed with the use of a deadly weapon. *See State v. Wall,* 304 N.C. 609, 614, 286 S.E.2d 68, 72 (1982) ("[T]he unambiguous language of the 1977 revision makes it clear that felonies 'committed or attempted with the use of a deadly weapon' will support a conviction of first-degree murder under the felony-murder rule.").

"In matters of statutory construction the task of the Court is to determine the legislative intent, and the intent is ascertained in the first instance 'from the plain words of the statute.' " *N.C. Sch. Bds. Ass'n v. Moore*, 359 N.C. 474, 488, 614 S.E.2d 504, 512 (2005) (quoting *Elec. Supply Co. v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991)). "[U]ndefined words are accorded their plain meaning so long as it is reasonable to do so." *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258, 794 S.E.2d 785, 792 (2016) (alteration in original) (quoting *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998)). If the legislature's intent is not apparent from the plain language of the statute, the Court then considers the legislative history, meaning "the spirit of the act and what the act

seeks to accomplish." *Id.* "[W]here a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." *State v. Barksdale,* 181 N.C. 621, 625, 107 S.E. 505, 507 (1921).

"A deadly weapon is generally defined as any article, instrument or substance which is likely to produce death or great bodily harm." *Sturdivant*, 304 N.C. at 301, 283 S.E.2d at 725. This is consistent with the definition contained in *Black's Law Dictionary*, which defines a deadly weapon as "[a]ny firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death." *Deadly Weapon*, *Black's Law Dictionary* (11th ed. 2019). Neither of these definitions is consistent with defining "deadly weapon" to include a person's own hands and arms because a person's hands and arms are not an "article," "instrument," "substance," "device," or "material" as those words are used in the definitions above. The plain language of the statute, then, suggests that hands and arms are not "deadly weapons" that would lead to criminal liability for felony murder.

To the extent that the statutory language here is ambiguous, we are then required to ascertain legislative intent to determine the meaning of a statute. *Winkler v. N.C. State Bd. of Plumbing*, 374 N.C. 726, 730, 843 S.E.2d 207, 210 (2020). "The intent of the General Assembly may be found first from the plain language of the

statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish." *State v. Rankin*, 371 N.C. 885, 889, 821 S.E.2d 787, 792 (2018) (quoting *State v. Langley*, 371 N.C. 389, 395, 817 S.E.2d 191, 196 (2018)).

Here, the legislative history and spirit of the act clearly demonstrate that the "deadly weapon" requirement refers to an external instrument, not a defendant's hands, feet, or other body parts. Subsection 14-17(a), our first-degree murder statute, draws a distinction between the enumerated felonies, which may always serve as a predicate felony under the felony murder rule, and "other felon[ies]," which may serve as a predicate felony only when committed or attempted with the use of a deadly weapon. N.C.G.S. § 14-17(a). As discussed previously, this distinction did not exist prior to 1977. *See Streeton*, 231 N.C. at 305, 56 S.E.2d at 652. Instead, any "other felony" could serve as a predicate for felony murder. *State v. Davis*, 305 N.C. 400, 423, 290 S.E.2d 574, 588 (1982). However, when it added the "deadly weapon" requirement in 1977, the General Assembly rejected the longstanding practice of our courts to construe felony murder "to include at least those killings committed during the commission of 'any other felony inherently dangerous to life' as murder in the first degree." *Id.* Thus, it cannot be the case that a "deadly weapon" includes a defendant's hands, feet, or other body parts. If that were true, then a defendant would be liable for first degree murder in any case where the defendant's commission of a felony results in a death, or where the "felony [is] inherently dangerous to life." *See Streeton*, 231 N.C. at 305, 56 S.E.2d at 652. However, this is precisely the outcome that the

General Assembly rejected by adding the deadly weapon requirement in 1977. *Davis*, 305 N.C. at 423, 290 S.E.2d at 588 (acknowledging that "in apparent response to holdings such as in *Streeton*," the General Assembly amended the felony murder statute "to substitute for the phrase 'or other felony' the phrase 'or other felony committed or attempted with the use of a deadly weapon' "). A proper construction of subsection 14-17(a), given the purpose and historical context of the felony murder rule, would acknowledge that this delineation suggests that the spirit of the statute seeks to limit "deadly weapons" to items external to the human body that the perpetrator of a crime brings into the fray and thereby increases the violent nature of an already dangerous crime, elevating an unenumerated felony to the level of a predicate felony for purposes of the felony murder rule. *See* N.C.G.S. § 14-17(a).

The majority does not look to "the plain language of the statute, . . . the legislative history, the spirit of the act and what the act seeks to accomplish" to ascertain legislative intent and determine the statute's meaning. *See Rankin*, 371 N.C. at 889, 821 S.E.2d at 792. Instead, the majority chooses to rely on the principle of legislative acquiescence. However, the majority's approach is contrary both to our charge "to determine the meaning that the legislature intended *upon the statute's enactment*," *see id.* (emphasis added), and to the principle that "it is this Court's ultimate duty to construe statutes," *State v. Jones*, 358 N.C. 473, 483, 598 S.E.2d 125, 131 (2004).

*Earls, J., concurring in result only in part and dissenting in part*

The cases on which the majority relies do not support its analysis. For example, the majority relies on *State v. Gardner* for the proposition that we defer to the principle of legislative acquiescence whenever our "appellate courts" have engaged in a practice undisturbed by legislative intervention. *See State v. Gardner*, 315 N.C. 444, 462, 340 S.E.2d 701, 713 (1986). However, in *Gardner*, we noted that "this Court ha[d] uniformly and frequently . . . from as early as the turn of the century" engaged in the practice being challenged, in that case treating breaking and/or entering and larceny as distinct crimes. *Id.* When reviewing the relevant cases, the Court in *Gardner* cited to only one case from the Court of Appeals. *Id.* This is, of course, because "precedents set by the Court of Appeals are not binding on this Court." *Mazza v. Med. Mut. Ins. Co.*, 311 N.C. 621, 631, 319 S.E.2d 217, 223 (1984). Similarly, in *Jones*, on which the majority also relies, we observed that "our judiciary . . . [had] universally adhered to the practice of classifying possession of cocaine as a felony" for nearly twenty-five years in the face of multiple clarifying amendments to the relevant statute that did not seek to change the practice when relying on the principle of legislative acquiescence. *Jones*, 358 N.C. at 483–84, 598 S.E.2d at 131–32. While the majority also relies on *Young v. Woodall*, that case rejected the canon of legislative acquiescence and noted that "legislative inaction is not necessarily evidence of legislative approval, and that the inquiry must focus on the statute itself." *Young v. Woodall*, 343 N.C. 459, 463, 471 S.E.2d 357, 359–60 (1996) (citing *DiDonato v. Wortman*, 320 N.C. 423, 435, 358 S.E.2d 489, 490 (1987)).

Having decided to proceed on this thin authority, the majority cites one case from this Court in which we held that a defendant's hands could be deadly weapons where an adult brutally assaults a small child.[1] *See State v. Pierce*, 346 N.C. 471, 493, 488 S.E.2d 576, 589 (1997). The majority also cites a number of cases from the Court of Appeals; however, "precedents set by the Court of Appeals are not binding on this Court." *Mazza*, 311 N.C. at 631, 319 S.E.2d at 223. Further, the majority cites no authority for the proposition that cases from the Court of Appeals, rather than cases from this Court, are relevant to the question of legislative acquiescence on a question of statutory interpretation.

In *Pierce*, the defendant was an adult male weighing approximately 150 pounds. *Pierce*, 346 N.C. at 493, 488 S.E.2d at 589. His victim was his two-year-old niece, Tabitha. *Id.* at 479, 488 S.E.2d at 580. The defendant "admitted 'smacking' Tabitha ten times in the three weeks prior to her death, slapping Tabitha on the night she was taken to the hospital, and shaking her very hard on that night." *Id.* at 492, 488 S.E.2d at 588. Based on that and other evidence—which included evidence tending to show that he and another person shook Tabitha, beat her with their fists, beat her with a belt, beat her with a metal tray, beat her with a broken antenna, and

---

[1] The majority claims that accepting Mr. Steen's argument—that hands and arms are not deadly weapons in an assault by one adult on another—would be inconsistent with this Court's longstanding interpretation of the deadly weapon requirement. Tellingly, none of the cases cited by the majority involve the use of hands or feet. *See State v. Hales*, 344 N.C. 419, 426, 474 S.E.2d 328, 332 (1996) (fire); *State v. Peacock*, 313 N.C. 554, 563, 330 S.E.2d 190, 196 (1985) (glass vase); *State v. Joyner*, 295 N.C. 55, 64–65, 243 S.E.2d 367, 373–74 (1978) (soda bottle).

*Earls, J., concurring in result only in part and dissenting in part*

beat her with a pair of tennis shoes, *id.*—a jury found the defendant guilty of first-degree murder by torture and by the felony murder rule, as well as felonious child abuse, *id.* at 479, 488 S.E.2d at 580. Felonious child abuse was the underlying felony for felony murder. *Id.* at 493, 488 S.E.2d at 589. Under those circumstances, we held that "[w]hen a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons." *Id.*

The situation before us today is quite different. While the assault on Sandra Steen was certainly terrible, she was not a small child. She was an able-bodied adult who actively worked on a farm. Mr. Steen was seven inches taller than her and outweighed her by sixty-five pounds. *Steen*, 264 N.C. App. at 579, 826 S.E.2d at 487. This is far different from the situation in *Pierce*, where the defendant was a 150-pound man who beat a two-year-old child to death. *Pierce*, 346 N.C. at 493, 488 S.E.2d at 589.

Of particular concern is the majority's reliance on our decision in *State v. Peacock*. There, we considered whether a defendant's conviction of robbery with a dangerous weapon could stand where the defendant had used a glass vase to strike the victim's head. *State v. Peacock*, 313 N.C. 554, 563, 330 S.E.2d 190, 196 (1985). Central to our analysis was the fact that "[t]he evidence showed that defendant [was] a large man and that [the victim], an elderly female, weighed only seventy-three pounds." *Id.* However, we have since held that, for purposes of the robbery with a dangerous weapon statute, "a defendant's hands and feet may not be considered

dangerous weapons." *State v. Hinton*, 361 N.C. 207, 211, 639 S.E.2d 437, 440 (2007). When determining a weapon's dangerousness for purposes of robbery with a dangerous weapon, we consider the relative size and strength of the defendant and victim. *Peacock*, 313 N.C. at 563, 330 S.E.2d at 196. Even so, it is still true that "a defendant's hands and feet may not be considered dangerous weapons" for purposes of that statute. *Hinton*, 361 N.C. at 211, 639 S.E.2d at 440. This totally belies the majority's claim that permitting hands and arms to be considered deadly weapons for purposes of the felony murder statute is necessary to maintain consistency with the manner in which this Court has defined the expression "deadly weapon" for many years.

I believe this case should be controlled by our decision in *Hinton*. There, we held that hands could not be deadly weapons for purposes of robbery with a dangerous weapon. *Hinton*, 361 N.C. at 210–12, 639 S.E.2d at 440–41. We concluded that the statute's use of the word "means" was ambiguous[2] and applied the rule of lenity, "which requires us to strictly construe the statute." *Id.* at 211, 639 S.E.2d at 440. We then concluded that "the General Assembly intended to require the State to prove that a defendant used an external dangerous weapon before conviction under the statute is proper." *Id.* at 211–12, 639 S.E.2d at 440. Here, to the extent that the term

---

[2] The dangerous weapon element of the statute applies to any person "having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means." *State v. Hinton*, 361 N.C. 207, 209–10, 639 S.E.2d 437, 439 (2007) (quoting N.C.G.S. § 14-87(a) (2005)).

"weapon" is ambiguous, the same analysis would lead us to the conclusion that the term requires an external instrument.

Our holding in *Hinton* is consistent with the law in most other jurisdictions. *See United States v. Rocha,* 598 F.3d 1144, 1155 (9th Cir. 2010) ("Most states have determined that body parts cannot be considered a dangerous or deadly weapon."). A majority of jurisdictions have held that body parts are not deadly weapons because to hold otherwise would erase the distinction between crimes committed with deadly weapons and without. *See, e.g., Rocha*, 598 F.3d at 1157 (holding that the mere use of a body part does not constitute use of a "dangerous weapon" because the statute separately punished assault by striking, beating, or wounding, indicating congressional intent that a defendant use a weapon or some other object to perpetrate the offense); *State v. LaFleur*, 307 Conn. 115, 140, 51 A.3d 1048, 1063 (2012) ("[T]he legislature intended the term 'dangerous instrument' to mean a tool, implement or device that is external to, and separate and apart from, the perpetrator's body."); *People v. Aguilar*, 16 Cal. 4th 1023, 1026–27, 945 P.2d 1204, 1206 (1997) (holding that a deadly weapon must be an object extrinsic to the human body); *State v. Gordon*, 161 Ariz. 308, 311, 778 P.2d 1204, 1207 (1989) (holding that the trial court erred by allowing the jury to find that fists were "dangerous instruments" for purposes of enhancing felony sentences); *People v. Vollmer*, 299 N.Y. 347, 350, 87 N.E.2d 291, 293 (1949) ("When the Legislature talks of a 'dangerous weapon', it means something quite different from the bare fist of an ordinary man."); *State v. Henderson*, 356 Mo.

1072, 204 S.W.2d 774 (1947) (finding no error in a judgment because the defendant used a broomstick when assaulting his wife and not his own hands and feet); *State v. Calvin*, 209 La. 257, 266, 24 So. 2d 467, 469 (1945) (holding that there must be proof of the use of some instrumentality in order to find a defendant guilty of assault with a dangerous weapon); *Bean v. State*, 77 Okla. Crim. 73, 138 P.2d 563 (1943) (holding that the jury instruction that the defendant could be found guilty of assault with a dangerous weapon if he was found to have only used his fists was error); *Wilson v. State*, 162 Ark. 494, 496, 258 S.W. 972, 972 (1924) ("[W]here one attacks another using no other weapon than by striking with his fist, or kicking, he does not use a deadly weapon in the sense of the statute.").

In Missouri, for example, the appellate courts have directly addressed whether fists may be considered an "instrument, article or substance," and thus a "dangerous instrument" under a definition of "deadly weapon" similar to our own. *State v. Evans*, 455 S.W.3d 452, 457 (Mo. Ct. App. 2014). Rather than forecasting the potential absurdity of categorizing a defendant's hands as deadly weapons, the Missouri appellate court took a linguistic approach, considering the most natural reading of the phrase "dangerous instrument." *Id.* at 258. In *Evans*, the Missouri appellate court concluded that "a reasoned and common-sense reading of the terms 'instrument, article or substance' . . . indicate an external object or item, rather than a part of a person's body." *Id.* at 458; *see* The Oxford College Dictionary 701 (2d ed. 2007) (defining "instrument" as "a tool or implement, esp. one for delicate or scientific

work"). The court further noted that the "dangerous instrument" classification "indicates the legislature's intent to impose greater punishment on those individuals who choose to use an item or weapon to commit a crime than those who do not," going on to say that "[t]his is logical when considering that likely a majority of the time, the potential for greater harm is present when persons committing crimes hold sharp, heavy, or otherwise potentially harmful objects, than if they have only their own hands at their disposal." *Evans*, 455 S.W.3d at 459. Thus, the court concluded that the defendant there, who had used only his fists to perpetrate first-degree assault with a dangerous instrument, could not be found guilty because his fists could not be an "instrument, article or substance." *Id.* at 457–61.

I find the *Evans* reasoning persuasive. In regard to North Carolina's felony murder rule, our legislature's distinction between the enumerated felonies not requiring the use of a deadly weapon and the unenumerated felonies requiring the use of a deadly weapon also indicates a purpose to more greatly punish those who decide to use an additional item or weapon in the perpetration of a felony than those who do not. Similarly, this Court ought to decline to read the phrase "deadly weapon" to include parts of the human body outside of the limited context we have previously approved and conclude that the legislature intended to limit the application of the phrase "deadly weapon" to items external to the human body.

Requiring an external implement for the felony murder statute's deadly weapon requirement is consistent with our own precedents. Consider this Court's

holding in *State v. Fields*, 315 N.C. 191, 337 S.E.2d 518 (1985), that a defendant need not physically use the deadly weapon to commit the felony in order to be guilty of murder under the felony murder rule, rather "possession is enough." *Id.* at 199, 337 S.E.2d at 523 ("Even under circumstances where the weapon is never used, it functions as a backup, an inanimate accomplice that can cover for the defendant if he is interrupted."). Our description in *Fields* suggests that a deadly weapon is some additional, external object that a defendant carries for use during the commission of the crime. Further, in that case we wrote:

> We hold that possession is enough, and the defendant is guilty of felony murder, even if the weapon is not *physically* used to actually commit the felony. If the defendant has brought the weapon along, he has at least a psychological use for it: it may bolster his confidence, steel his nerve, allay fears of his apprehension. Even under circumstances where the weapon is never used, it functions as a backup, an inanimate accomplice that can cover for the defendant if he is interrupted.

*Id.* This description of the deadly weapon requirement is inconsistent with today's holding. If, as we held in *Fields*, the General Assembly intended to include felonies where the defendant obtained a "psychological use" benefit to having a deadly weapon—where the weapon "bolster[ed] his confidence, steel[ed] his nerve, allay[ed] fears of his apprehension"—it seems highly unlikely that the General Assembly contemplated that a defendant using only his hands would receive such a benefit.

While the majority claims to uphold legislative intent through the principle of legislative acquiescence, it actually subverts the legislature's intent as evidenced by

the statute's history and structure and is inconsistent with our own precedent. With today's holding, the majority undoes the General Assembly's 1977 amendment to the statute in the name of vindicating a dimly perceived legislative intent divined by the doctrine of acquiescence to the Court of Appeals precedent.

I agree with the majority's contention that we are not called upon to reconsider our holding in *Pierce*, in which we concluded that an adult defendant's hands could be considered deadly weapons for the purposes of the felony murder rule when the predicate offense is felonious child abuse.

More than a century before our holding in *Pierce*, this Court held that

> [a]n instrument, too, may be deadly or not, according to the mode of using it, or the subject on which it is used. For example, in a fight between men, the fist or foot would not, generally, be regarded as endangering life or limb. But it is manifest, that a wilful [sic] blow with the fist of a strong man, on the head of an infant, or the stamping on its chest, producing death, would import malice from the nature of the injury, likely to ensue.

*State v. West*, 51 N.C. 505, 509 (1859); *see also State v. Lang*, 309 N.C. 512, 525–26, 308 S.E.2d 317, 324 (1983) ("[I]f an assault were committed upon an infant of tender years or upon a person suffering an apparent disability which would make the assault likely to endanger life, the jury could . . . find that the defendant's hands or feet were used as deadly weapons."). I would take this opportunity to provide clarity about seemingly inconsistent decisions from this Court and hold that a distinction between an adult victim and a child victim is consistent with this Court's prior holding that whether a weapon may be considered deadly is a question of whether it would or

would not be likely to produce deadly results. Generally, most adults are far less vulnerable than children to an attack from an adult using only the attacker's hands. Children are generally likely to be much smaller and weaker than an adult attacker, and the adult attacker's hands would, therefore, be more dangerous when used against a child than when used against an adult.

As such, I do not believe this Court ought to join the small minority of jurisdictions that allow a defendant's hands and other body parts to be considered deadly weapons when used by an adult against an adult victim. It is worth repeating that today's holding renders meaningless the statute's distinction between the enumerated felonies and others and will invariably lead to absurd results encompassing situations beyond those intended by the General Assembly.

Fortunately, the majority has wisely limited its holding here to the felony murder context. As a result, it remains the case that a defendant's body parts may not be considered deadly weapons for purposes of robbery with a dangerous weapon. *See Hinton*, 361 N.C. at 210–12, 639 S.E.2d at 440–41. A convicted defendant who has used their hands to assault another person and inflict serious bodily injury remains, after today's decision, a Class F felon, *see* N.C.G.S. § 14-32.4(a) (2019) (criminalizing assault inflicting serious bodily injury), and not a Class E felon, *see* N.C.G.S. § 14-32(b) (2019) (criminalizing assault with a deadly weapon inflicting serious bodily injury). This is because, as the majority notes, the question is one of statutory interpretation, and each statute must be interpreted on its own (as the

majority does today by refusing to following our decision in *Hinton*) to effectuate the intent of the legislature. In future cases if this issue arises, no doubt this Court will effectuate the intent of the legislature and avoid collapsing distinct offenses into one another, as we did in *Hinton*.

The majority claims that today's pronouncement, that hands and arms may be considered deadly weapons for purposes of the felony murder statute, will avoid unnecessary confusion in the state's criminal law. In reality, the majority runs away from the considered holding of our decision in *Hinton* in order to reinstate a line of decisions that was firmly rejected by the General Assembly in 1977. In so doing, the majority creates a rule that runs counter to the ordinary meaning of the term "deadly weapon," risking criminal liability for first degree murder whenever a felony results in death. I disagree that our murder statute should be so far expanded. For all of these reasons, I respectfully concur in the result only, in part, and dissent, in part.

Chief Justice BEASLEY joins in this opinion concurring in the result only in part and dissenting in part.